```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,    )    CRIMINAL NOS. 21-00061-LEK
 4                                 )                   23-00003-LEK
                   Plaintiff,      )
 5                                 )    Honolulu, Hawaii
              vs.                  )
 6                                 )    February 13, 2025
      MARTIN KAO,                  )
 7                                 )    SENTENCING AS TO COUNTS 1
                   Defendant.      )    THROUGH 8 UNDER CRIMINAL
 8                                 )    NUMBER 21-00061 AND COUNT 1
                                   )    UNDER 23-00003 TO THE
 9    _____  )    INDICTMENT

10                     TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE LESLIE E. KOBAYASHI,
11              SENIOR UNITED STATES DISTRICT COURT JUDGE

12    APPEARANCES:

13    For the Plaintiff:           CRAIG S. NOLAN, ESQ.
                                   Office of the United States Attorney
14                                 PJKK Federal Building
                                   300 Ala Moana Boulevard, Suite 6100
15                                 Honolulu, Hawaii  96850

16    For the Defendant:           VICTOR J. BAKKE, ESQ.
                                   Law Office of Victor Bakke
17                                 Topa Financial Center
                                   700 Bishop Street, Suite 2100
18                                 Honolulu, HI 96813

19                                 MELINDA K. YAMAGA, ESQ.
                                   Office of the Federal Public
20                                 Defender
                                   PJKK Federal Building
21                                 300 Ala Moana Blvd Rm 7-104
                                   Honolulu, HI 96850

22
      Official Court Reporter:     Gloria T. Bediamol, RPR RMR CRR FCRR
23                                 United States District Court
                                   300 Ala Moana Boulevard
24                                 Honolulu, Hawaii 96850

25     Proceedings recorded by machine shorthand, transcript produced
       with computer-aided transcription (CAT).
```

|          |    |                                                                           |
|----------|----|---------------------------------------------------------------------------|
|          | 1  | February 13, 2025                                    1:33 p.m.             |
| 01:33PM  | 2  | THE CLERK:  Criminal Numbers 21-00061-LEK and                             |
| 01:33PM  | 3  | 23-00003-LEK, United States of America versus Martin Kao.                 |
| 01:33PM  | 4  | This case has been called for sentencing as to Counts                     |
| 01:33PM  | 5  | 1 through 8 under Criminal Number 21-61 and Count 1 under 23-03           |
| 01:33PM  | 6  | to the indictment.                                                        |
| 01:33PM  | 7  | Counsel, please make your appearances for the record.                     |
| 01:33PM  | 8  | MR. NOLAN:  Good afternoon, Your Honor.  Craig Nolan                      |
| 01:33PM  | 9  | for the government.  Also present is Sara Nieling of the                  |
| 01:33PM  | 10 | probation office.                                                         |
| 01:33PM  | 11 | THE COURT:  Good afternoon to you both.                                   |
| 01:33PM  | 12 | MR. BAKKE:  Good afternoon, Your Honor.  Attorney                         |
| 01:33PM  | 13 | Victor Bakke on behalf of Mr. Kao.                                        |
| 01:33PM  | 14 | Your Honor, I'm representing him in Criminal Number                       |
| 01:34PM  | 15 | 21-00061, and Mr. Kao is obviously present.                               |
| 01:34PM  | 16 | THE COURT:  All right.  The record will reflect the                       |
| 01:34PM  | 17 | presence of Mr. Kao.  How are you today, sir?                             |
| 01:34PM  | 18 | THE DEFENDANT:  I'm okay.  Thank you for asking.                          |
| 01:34PM  | 19 | THE COURT:  Thank you.                                                     |
| 01:34PM  | 20 | Ms. Yamaga.                                                               |
| 01:34PM  | 21 | MS. YAMAGA:  Thank you, Your Honor.  Good afternoon,                      |
| 01:34PM  | 22 | Melinda Yamaga, I am also representing Mr. Kao; however, I am             |
| 01:34PM  | 23 | representing him in Criminal Number 23-00003-LEK.                         |
| 01:34PM  | 24 | THE COURT:  All right.  Will each of you or only one                      |
| 01:34PM  | 25 | of you be making argument with regard to sentencing?                      |

01:34PM  1              MR. BAKKE:  I will be, Your Honor.  I will be lead on
01:34PM  2  this.
01:34PM  3              THE COURT:  All right.  Very good.  Do you need some
01:34PM  4  time to have the hearing assistance?  I saw you struggling.
01:34PM  5              MR. BAKKE:  No, we did it ahead of time.
01:34PM  6              THE COURT:  Very good.  Is it working?
01:34PM  7              MR. BAKKE:  Yes.
01:34PM  8              THE COURT:  Do you need help?  Very good.
01:34PM  9              MS. YAMAGA:  I will have one comment specific to my
01:34PM  10  case in the criminal forfeiture order that was signed; that's
01:34PM  11  it.
01:34PM  12              MR. BAKKE:  So we won't be overlapping, Judge.
01:35PM  13              THE COURT:  Sounds very good.  Thank you.  So everyone
01:35PM  14  but Mr. Kao and Mr. Bakke may be seated.
01:35PM  15              All right.  So, Mr. Kao, we are here -- you need to
01:35PM  16  stand -- so we're here today for your sentencing hearing.  At
01:35PM  17  this hearing, I'm going to make certain factual findings and
01:35PM  18  then I'm going to go over what I believe to be the aggravating
01:35PM  19  and mitigating factors in your case.  And then I'm going to
01:35PM  20  hear from Mr. Nolan on behalf of the government, on the
01:35PM  21  government's position on what an appropriate sentence is for
01:35PM  22  you.
01:35PM  23              An appropriate sentence is one under the law that's
01:35PM  24  sufficient but not greater than necessary to meet the goals of
01:35PM  25  sentencing.  And the goals of sentencing include just

| 01:35PM | 1 | punishment for the harm that you have done to our community, an |
| 01:35PM | 2 | opportunity to prevent you and others from committing these |
| 01:35PM | 3 | types of crimes in our community, and to give you an |
| 01:36PM | 4 | opportunity for rehabilitation. |
| 01:36PM | 5 | And then of course I'm going to hear from Mr. Bakke |
| 01:36PM | 6 | and Ms. Yamaga, and then you'll have an opportunity to speak on |
| 01:36PM | 7 | your behalf, if you wish.  You don't have to, it won't be held |
| 01:36PM | 8 | against you if you don't.  And then I'm going to take all of |
| 01:36PM | 9 | this information, in addition to the very comprehensive |
| 01:36PM | 10 | presentence investigation report, and I will use that to |
| 01:36PM | 11 | fashion your sentence.  All right? |
| 01:36PM | 12 | So let me first ask you to confirm that you and your |
| 01:36PM | 13 | attorneys have had a full opportunity to reread, review and to |
| 01:36PM | 14 | file any objections to the contents of the presentence |
| 01:36PM | 15 | investigation report.  Have you had that opportunity, Mr. Kao? |
| 01:36PM | 16 | THE DEFENDANT:  Yes, Your Honor. |
| 01:36PM | 17 | THE COURT:  You would agree with that, Mr. Bakke? |
| 01:36PM | 18 | MR. BAKKE:  Yes, Your Honor. |
| 01:36PM | 19 | THE COURT:  Ms. Yamaga. |
| 01:36PM | 20 | MS. YAMAGA:  Yes, Your Honor. |
| 01:36PM | 21 | THE COURT:  All right.  You may all be seated. |
| 01:36PM | 22 | The Court makes the following factual findings that on |
| 01:36PM | 23 | September 7, 2022, Mr. Kao, you pled guilty to the eight-count |
| 01:37PM | 24 | indictment charging you in Criminal Number number 21-61, Counts |
| 01:37PM | 25 | 1, 2, 3, which charged you with Wire Fraud Scheme in Relation |

01:37PM   1   to a Presidentially Declared Emergency in violation of federal

01:37PM   2   law; Counts 4 through 8, Money Laundering, in violation of

01:37PM   3   federal law; and in Criminal Number 23-03, to Count 1, Bank

01:37PM   4   Fraud.

01:37PM   5            I now place the presentence investigation report in

01:37PM   6   the record under seal.  If an appeal is taken, counsel will

01:37PM   7   have access to all of the report including the confidential

01:37PM   8   recommendation.

01:37PM   9            I have received several letters in support that were

01:37PM   10  attached to your sentencing memorandum in 23-0003-LEK and I've

01:37PM   11  gone through all of them.

01:37PM   12           Mr. Nolan, it's my understanding the government has no

01:37PM   13  remaining objections to either the factual findings or the

01:38PM   14  application of the guidelines to the facts; is this correct?

01:38PM   15           MR. NOLAN:  That is correct, Your Honor.

01:38PM   16           THE COURT:  Mr. Bakke and Ms. Yamaga, are there any

01:38PM   17  remaining objections that the Court needs to address?

01:38PM   18           MR. BAKKE:  None from me, Your Honor.

01:38PM   19           MS. YAMAGA:  No, Your Honor.  Thank you.

01:38PM   20           THE COURT:  Then the Court adopts the factual findings

01:38PM   21  in the presentence report including the addendum that addressed

01:38PM   22  all of the objections.  I agree with probation.

01:38PM   23           There has been a request for the Court to consider

01:38PM   24  specific 3553(a) factors of Mr. Kao, and that's set forth in

01:38PM   25  the sentencing memorandum, in which I have read.  So based on

01:38PM   1   all of this information, the Court determines that the

01:38PM   2   applicable guidelines are:  Total offense level 29, criminal

01:38PM   3   history category 1.  This gives a guideline range of 87 to

01:38PM   4   108 months, as to Counts 1 through 3, under Criminal Number

01:39PM   5   21-61; and Count 1, under Criminal Number 23-03; and as to

01:39PM   6   Counts 4 through 8, under Criminal Number 21-61.

01:39PM   7           Supervised release, the guideline range is two to five

01:39PM   8   years, as to Counts 1 through 3, under Criminal Number 21-61;

01:39PM   9   Count 1, under Criminal Number 23-03, the statutory maximum is

01:39PM  10   up to five years; as to Counts 4 through 8, under Criminal

01:39PM  11   Number 21-61, the statutory maximum is up to three years.

01:39PM  12           Fine plus cost of imprisonment and supervised release,

01:39PM  13   the guideline range is $30,000 to $1 million.  The statutory

01:39PM  14   provisions are for Counts 1 through 3, under Criminal Number

01:39PM  15   21-61, and Count 1, under Criminal Number 23-03, is up to

01:40PM  16   $1 million.  As to Counts 4 through 8, under Criminal Number

01:40PM  17   21-61, the statutory provision is up to $250,000 or twice the

01:40PM  18   amount of the criminally derived property involved.

01:40PM  19           Restitution is in the amount of $12,841,490.  And

01:40PM  20   there's a mandatory special assessment of $100 per count for a

01:40PM  21   total of $900.

01:40PM  22           So these are the factors the Court sees in aggravation

01:40PM  23   and mitigation, Mr. Kao.

01:40PM  24           In aggravation, I first turn to the nature and

01:40PM  25   circumstances of the offenses to which you pled guilty.  In

01:40PM  1    your situation you, through your company Navatek, applied for
01:40PM  2    three Paycheck Protection Program loans during the COVID-19
01:41PM  3    pandemic.  These loan requests totalled $15,694,329.  You
01:41PM  4    committed fraud because the applications contained false
01:41PM  5    information about your company's payroll and the number of
01:41PM  6    employees which were all falsified.  You also falsely stated
01:41PM  7    that Navatek would not receive any other PPP loans.
01:41PM  8         To compound this falsity, you used influence and
01:41PM  9    pressure on senior bank officials to process the loan quickly
01:41PM  10   by stating you had a relationship with our senators and
01:41PM  11   congresswoman in congress, and that they supported a quick
01:41PM  12   approval.  As a result of these false applications, you
01:41PM  13   received $12,841,491 for two loans, the third loan was denied,
01:42PM  14   and you directed others to move those loan proceeds to
01:42PM  15   different accounts, including $2 million to your personal
01:42PM  16   account.  You enriched yourself at the expense of local
01:42PM  17   businesses that were struggling and suffering and needed
01:42PM  18   emergency funds.  And ultimately, as a result of your actions,
01:42PM  19   it's the taxpayers of this country, of our community, who have
01:42PM  20   been defrauded and left holding literally the bag to pay for
01:42PM  21   all of these millions.
01:42PM  22        Other factors are characteristics.  You have a prior
01:42PM  23   conviction for assault, so you have a history of violence.  You
01:42PM  24   pled guilty and are awaiting sentencing in the District of
01:42PM  25   Columbia for conspiring to make unlawful federal campaign

01:43PM   1   contributions and then submitting false documents to hide these

01:43PM   2   contributions.  This demonstrates to the Court that you have

01:43PM   3   lived a life of a pattern of deceit and embezzlement and

01:43PM   4   entitlement and with a disregard for the law.

01:43PM   5            Another victim in your case is the Bank of Hawaii.

01:43PM   6   You altered multiple documents, when applying for a residence

01:43PM   7   on Kahala Avenue, and received a $3 million mortgage loan for

01:43PM   8   which you were not eligible.  As a result of your falsity, the

01:43PM   9   bank was forced to spend legal fees to foreclose, which will

01:43PM  10   continue incurring costs until the loan is paid off.

01:43PM  11            I've looked at your financial information in the

01:43PM  12   presentence report.  There are several properties that you are

01:43PM  13   on deed for, two in Kahala one in Beverly Hills; there's

01:44PM  14   investment properties; there are cars, including a Mercedes and

01:44PM  15   Ferrari.  So the question becomes why.  And I can only conclude

01:44PM  16   it was simply and blatantly greed.

01:44PM  17            There are factors in mitigation.  You have education

01:44PM  18   and training to support yourself in a legally and acceptable

01:44PM  19   way; you have no history of mental illness; you have no history

01:44PM  20   of drug addiction, although to your credit you self-reported an

01:44PM  21   alcohol addiction while on bond; you have the support of your

01:44PM  22   wife; you have two young children, ages eight and 9, one of

01:44PM  23   whom has disabilities and needs assistance in that for autism

01:44PM  24   and hearing impairment; and you have done volunteer work while

01:44PM  25   on bond with your church, Meals on Wheels.  So those are the

| | | |
|---|---|---|
| 01:44PM | 1 | factors in mitigation. |
| 01:45PM | 2 | So I'll turn now to Mr. Nolan with regard to the |
| 01:45PM | 3 | government's position on an appropriate sentence. |
| 01:45PM | 4 | Mr. Nolan. |
| 01:45PM | 5 | MR. NOLAN:  Sure.  Thank you, Your Honor.  Before I |
| 01:45PM | 6 | get to our position, I just want to put on the record that |
| 01:45PM | 7 | PacMar, through its -- I may get his title wrong -- |
| 01:45PM | 8 | president/owner, Steven Loui, is present.  The probation office |
| 01:45PM | 9 | found to be PacMar victim, couldn't sort out the legal bills |
| 01:45PM | 10 | well enough to come up with a definitive restitution figure. |
| 01:45PM | 11 | Mr. Loui, through his attorney, Jesse Schiel, who is also |
| 01:45PM | 12 | present, has asked to address the Court.  So is the Court -- |
| 01:45PM | 13 | THE COURT:  Yes, absolutely.  Victims have a right to, |
| 01:45PM | 14 | and if there is anyone from Bank of Hawaii, I would encourage |
| 01:45PM | 15 | them to come forward as well. |
| 01:45PM | 16 | MR. NOLAN:  We don't have representatives of the |
| 01:45PM | 17 | victim banks here or the Small Business Administration.  Would |
| 01:46PM | 18 | you like Mr. Loui to come forward now? |
| 01:46PM | 19 | THE COURT:  Yes, please, to the podium if he's |
| 01:46PM | 20 | comfortable.  If not, then next to you at counsel table. |
| 01:46PM | 21 | Whatever you are comfortable with.  Aloha.  Welcome. |
| 01:46PM | 22 | MR. LOUI:  Your Honor, thank you for allowing me the |
| 01:46PM | 23 | opportunity to speak today.  I am Steven Loui, owner of PacMar |
| 01:46PM | 24 | Technologies, formally known as Navatek.  I'm here to redeem |
| 01:46PM | 25 | myself from transferring the company I love and started to the |

01:46PM   1    con man and criminal Martin Kao, who has damaged the company I

01:46PM   2    founded and its loyal and outstanding employees.

01:46PM   3         Pacific Marine & Supply Company is a ship-repair

01:46PM   4    company founded in 1944 by my father, Fred Loui.  After my

01:46PM   5    father unexpectedly passed away in 1969, I returned home after

01:46PM   6    college, after graduating in engineering, to take over the

01:47PM   7    operations of the company.  Under my leadership, Pacific Marine

01:47PM   8    became the largest commercial ship repair and dry-docking

01:47PM   9    company in Hawaii.

01:47PM  10         To complement Pacific Marine's operations, I started

01:47PM  11    PacMar Technologies in the 1970s under its original name

01:47PM  12    "Navatek Limited."  Since its formation, PacMar's focus was on

01:47PM  13    developing advanced ships and marine technologies to improve

01:47PM  14    passenger ride quality, reduce operator injury, and improve

01:47PM  15    hull efficiency.  PacMar has since grown into a diversified

01:47PM  16    technology company with an international presence, leading the

01:47PM  17    way in research engineering, design, innovation and

01:47PM  18    hydrodynamics.

01:47PM  19         Mr. Kao joined Pacific Marine in 2008, several decades

01:47PM  20    after the company had been formed, and I would like to say

01:47PM  21    successful.  We are well known for our SWATH ships, dinner

01:47PM  22    boats and research ships that we had built.  Unbeknownst to me

01:48PM  23    until very recently, Mr. Kao's deceit began at hiring, where he

01:48PM  24    falsely represented orally, and in his resume, that he held law

01:48PM  25    degrees from UCLA and NYU.  It was only through his initial

01:48PM    1    deceit that I offered Mr. Kao a job.

01:48PM    2           In or around August 2018, after 40 years of running

01:48PM    3    the company, I decided to step away from the day-to-day

01:48PM    4    operations and believed I had found a worthy successor in

01:48PM    5    Mr. Kao to keep the company prospering and he would be one who

01:48PM    6    took good care of the employees.

01:48PM    7           Unfortunately, Mr. Kao did the opposite, running the

01:48PM    8    company immediately into the ground just one year through

01:48PM    9    numerous acts of criminality.  Mr. Kao's, criminality included

01:48PM   10    not only the PPP fraud but also campaign finance fraud and

01:49PM   11    mortgage fraud, all of which the Court is well aware of.

01:49PM   12           Upon learning of Mr. Kao's outsized PPP loans through

01:49PM   13    an article in the Star Advertiser in the summer of 2020, I

01:49PM   14    immediately reported Kao's fraud to law enforcement and

01:49PM   15    participated in law enforcement investigations to ensure that

01:49PM   16    Mr. Kao was held responsible for his actions and to make sure

01:49PM   17    that the company's reputation and name remained clear.

01:49PM   18    Thereafter, I immediately initiated state proceedings to have

01:49PM   19    Mr. Kao removed from the company and began the lengthy process

01:49PM   20    of saving the company.

01:49PM   21           In this short period, Kao virtually destroyed a very

01:49PM   22    productive and local company, one which had a great reputation

01:49PM   23    at all times prior to Mr. Kao joining it.  Approximately 91

01:49PM   24    employees, roughly half the company's work force, resigned

01:50PM   25    within nine months of Kao's arrest.  Kao's criminality

01:50PM   1   paralyzed the company's ability to secure vital government
01:50PM   2   contracts that are the life blood of its business.  Our
01:50PM   3   security holdings for our top secret research were put on hold
01:50PM   4   for many months until we were able to clear it.  In that time
01:50PM   5   we lost many jobs.  The company has managed to survive but only
01:50PM   6   through the loyal and incredibly dedicated work of its
01:50PM   7   remaining employees, some of which are here today.  I also
01:50PM   8   provided large financial support to meet the cash needs of the
01:50PM   9   company.
01:50PM  10          While Mr. Kao cannot defend his past, he now seeks the
01:50PM  11   mercy of the Court at sentencing conveniently asserting that he
01:50PM  12   has been reborn and found new meaning in life.  Put simply,
01:50PM  13   Martin's story, and all he has said about his request for a
01:51PM  14   reduction in sentencing because of his asserted rehabilitation
01:51PM  15   I believe is a fallacy.
01:51PM  16          Contrary to self-serving statements to this Court,
01:51PM  17   Mr. Kao has shown absolutely no remorse for the harm he has
01:51PM  18   caused to me, to the company, and the senior employees he fired
01:51PM  19   to clear a way for his criminal cohorts.  And certainly not to
01:51PM  20   any of the employees, including many of the hard-working loyal
01:51PM  21   employees who lost their jobs due to the wreckage he left
01:51PM  22   behind.  These -- the employees who stayed are the ones really
01:51PM  23   responsible for saving the company.
01:51PM  24          Mr. Kao has also shown no remorse by refusing to pay
01:51PM  25   the company back the millions he stole from it.  Instead of

01:51PM  1    repaying the company, Mr. Kao has hidden his millions in assets

01:51PM  2    through a series of fraudulent conveyances and other

01:51PM  3    misconduct.  We have multiple lawsuits to recover those funds.

01:52PM  4    Mr. Kao has defied all attempts and has not paid any of the

01:52PM  5    millions in damages that have been awarded against him, much of

01:52PM  6    which was simply stolen from the company.  For example, he --

01:52PM  7    contrary to the company's operating charter, he had the company

01:52PM  8    issue checks to pay for his defense attorney shortly after his

01:52PM  9    arrest.  Any amounts the company has received to date are due

01:52PM  10   to our costly legal actions to garnish wage and rental income.

01:52PM  11   The total Circuit Court awarded damages and accrued interest he

01:52PM  12   owes the company, as of the end of January, is $8,079,945.

01:52PM  13   This month, in fact it was posted on the internet this morning,

01:52PM  14   the company has incurred further costs of $500,000 in Federal

01:52PM  15   Election Commission fines and legal fees because of Kao's

01:52PM  16   political fraud.

01:53PM  17        Mr. Kao's claim of rebirth and enlightenment also run

01:53PM  18   contrary to his conduct before the Hawaii judiciary over the

01:53PM  19   past three years.  In the same state court case that led to his

01:53PM  20   disassociation from the company, Mr. Kao has been found and

01:53PM  21   held in contempt of court three times in 2024 alone.

01:53PM  22        The contempt orders arose from Martin's attempted end

01:53PM  23   around the Court's rulings against him related to the

01:53PM  24   garnishment of rental proceeds for two luxury properties owned

01:53PM  25   by Kao and his wife, Tiffany Lam -- one worth over 6 million in

01:53PM   1    Kahala and the other worth several million in Hawaii Loa Ridge.

01:53PM   2          After Mr. Kao refused to comply with the Court's

01:53PM   3    orders in that case, the Court found Mr. Kao in contempt of

01:53PM   4    court entered on May 2, 2024.  The Court's findings that Kao

01:53PM   5    engaged in bad faith and they stated:

01:53PM   6          "The Court views Mr. Kao's behavior as delaying the

01:54PM   7    proceedings in bad faith so that he can engage in evasive

01:54PM   8    behavior... The Court therefore finds that Kao had violated the

01:54PM   9    Court order and finds that Kao in contempt for violating that

01:54PM  10    order... Kao lacked a good faith excuse or reasonable basis for

01:54PM  11    failing to comply with the Court's order...  Consequently, the

01:54PM  12    Court finds that Kao's contempt -- Kao's conduct in refusing to

01:54PM  13    comply with the Court's order was 'entirely without color' and

01:54PM  14    advanced 'for reasons of harassment and other improper

01:54PM  15    purposes.'"

01:54PM  16          A month later, after he did not comply with the court

01:54PM  17    order, on June 13, 2024, the Court issued a second contempt

01:54PM  18    order.  Mr. Kao was found in contempt of court with the Court

01:54PM  19    finding as follows:

01:54PM  20          "The Court finds that Kao is in violation of the

01:54PM  21    Court's Contempt Order... Despite these repeated reminders and

01:54PM  22    efforts to compel Defendant Kao's compliance with the Court's

01:55PM  23    Contempt Order, Defendant Kao has refused to comply with the

01:55PM  24    Court's Contempt Order, just as he refused to comply with the

01:55PM  25    Court's prior orders which ultimately led to the Court's

01:55PM   1    Contempt Order.  This Court bent over backwards to try to be

01:55PM   2    fair to Defendant Kao.  But with his record of constant

01:55PM   3    evasion, no effort to try to lend any cooperation, recognition

01:55PM   4    that he had an enormous judgment debt, and doing everything to

01:55PM   5    avoid paying every penny, this Court is not able to issue a

01:55PM   6    ruling that would essentially excuse Defendant Kao and justify

01:55PM   7    his evasive behavior."

01:55PM   8         Defendant Kao was ordered to pay a civil fine to the

01:55PM   9    Court in the amount of $200 per day.

01:55PM   10        After Kao failed to comply with the second contempt

01:55PM   11   order, Kao was again found in contempt of court a third time

01:55PM   12   and entered on November 22, 2024.  The judge found as follows:

01:55PM   13        "The Court... finds that there is a record of

01:56PM   14   extremely evasive conduct by Kao, that his noncompliance with

01:56PM   15   the Court's Contempt Orders is and has been knowing and

01:56PM   16   willful, and that his defense of inability to pay and/or

01:56PM   17   poverty is not well taken given the extreme efforts he has

01:56PM   18   undertaken to avoid compliance of the Court's Contempt Orders."

01:56PM   19        Mr. Kao was ordered to pay a contempt fine of $500 per

01:56PM   20   day under the third contempt order.  Mr. Kao currently owes the

01:56PM   21   circuit court well over $80,000 in civil fines, which he has

01:56PM   22   refused to pay the judiciary to date and he continues to ignore

01:56PM   23   and defy the Court's rulings.

01:56PM   24        Mr. Kao has not made any restitution to the company or

01:56PM   25   to the Hawaii state judiciary in spite of owing or co-owning

01:56PM  1   with family members six properties in Hawaii with a fair market

01:56PM  2   value in excess of $15 million.  Additionally, after his arrest

01:56PM  3   in September 2000, he sold a Beverly Hills condo in June 2021

01:57PM  4   for $1,245,000 and was in the process of selling a Taiwan

01:57PM  5   property valued at $800,000.  We knew about the Taiwan property

01:57PM  6   because Kao illegally had the company pay his personal bills to

01:57PM  7   that attorney.  So in the over $2 million received from these

01:57PM  8   properties, none of it was used to make restitution to the

01:57PM  9   company or to the Hawaii judiciary.  If he was truly remorseful

01:57PM  10  of his actions and all the damages he caused, he would have

01:57PM  11  used the cash and sold as many additional properties that he

01:57PM  12  controlled to pay the court damages.

01:57PM  13          Mr. Kao continues his fraudulent transgressions

01:57PM  14  extending to the Department of Justice.  For his Washington

01:57PM  15  D.C. political fraud case, he was given a public defender

01:57PM  16  because of his claims of insolvency.  We know that throughout

01:57PM  17  2022 and possibly earlier, Kao was receiving $16,000 a month

01:58PM  18  from the Kahala property and $8,100 a month from the Hawaii Loa

01:58PM  19  property.  These were the rentals subject to our garnishment

01:58PM  20  orders which he also refused to acknowledge.

01:58PM  21          In addition to his real estate and rental property

01:58PM  22  income, Kao and his family committed charity fraud and

01:58PM  23  illegally received over $3.1 million cash from the liquidation

01:58PM  24  of a charity asset, a luxury San Francisco condominium on Nob

01:58PM  25  Hill.  These transgressions are a subject of two separate

01:58PM   1    lawsuits the company has filed -- excuse me, for charity fraud
01:58PM   2    and fraudulent property transfers.  From the discovery in those
01:58PM   3    cases, the stocks owned in the Kao family Ameritrade account
01:58PM   4    are worth over $4 million in 2021.  I had my staff update the
01:59PM   5    value of those stocks.  As of the end of the year they were
01:59PM   6    worth more than $9 million.

01:59PM   7         With Kao's extensive resources, he should have been
01:59PM   8    using them to pay the multiple court awards totalling
01:59PM   9    $8.2 million as part of his path to rehabilitation and
01:59PM  10    respecting laws and justice.  Instead, he is lavishing himself
01:59PM  11    by attending Harvard classes which we estimate cost in excess
01:59PM  12    of $30,000.

01:59PM  13         Based on all of the above and much more, PacMar
01:59PM  14    believes Mr. Kao deserves the maximum jail sentence allowable
01:59PM  15    by law.  His lack of providing any restitution to those damages
01:59PM  16    from his crimes demonstrates his lack of remorse or accepting
01:59PM  17    responsibility for his transgressions.  Far from being a
01:59PM  18    first-time offender, he has pled guilty to three separate
01:59PM  19    indictments and there are many more crimes that he has
01:59PM  20    committed and continues to commit that he has not been held
01:59PM  21    accountable for yet.  His request to the Court for a reduced
02:00PM  22    sentence citing his rehabilitation in my opinion is just a
02:00PM  23    continuing scam.  Thank you.

02:00PM  24         THE COURT:  Thank you very much.  I appreciate you
02:00PM  25    taking the time and those also from your company who came here

02:00PM   1    today.  You obviously put a lot of time and thought in your

02:00PM   2    statement, and I have listened to all of it.  So I thank you,

02:00PM   3    thank you very much.  Good luck to you, sir.

02:00PM   4         MR. NOLAN:  Thank you, Your Honor.  There is not a lot

02:00PM   5    more for the government to say.  The Court clearly has done its

02:00PM   6    reading, it's read everything, it had a comprehensive report by

02:00PM   7    the probation office, really an exceptional report in my view.

02:00PM   8    The Court has gone through aggravators and mitigators, but the

02:00PM   9    Court has distilled it.  It's greed, deceit and entitlement.

02:00PM  10    And me saying that ten more times doesn't make it any worse.

02:01PM  11         I do just want to take a moment though to recall that

02:01PM  12    about ten days before Mr. Kao submitted the first application,

02:01PM  13    the one for $10 million, this county was put under a

02:01PM  14    Stay-At-Home order.  So the world had come to a standstill in

02:01PM  15    March of 2020.  We didn't know what was happening.  We were

02:01PM  16    wiping down groceries with bleach wipes because we didn't

02:01PM  17    understand what was going on around us.

02:01PM  18         And while that was happening, we were trying to figure

02:01PM  19    out, How do we move forward?  How do we engage in business?

02:01PM  20    How do we do our work?  How do we take care of our kids?  How

02:01PM  21    do our kids get schooled?  I think it's fair to say that we

02:01PM  22    were all in some state of relative panic.  And so the

02:02PM  23    government's response at the municipal level, at the state

02:02PM  24    level, at the national level was to essentially shut us down

02:02PM  25    and shut down the economy.

02:02PM  1          This is a state full of small businesses, not unlike

02:02PM  2      many other states, but mom-and-pop shops, mom-and-pop

02:02PM  3      restaurants, family-owned institutions that have been around

02:02PM  4      for generations, new businesses struggling to make it for the

02:02PM  5      first time.  And their customer base was just wiped out, and

02:02PM  6      their employee base was wiped out.  Most of us were told to

02:02PM  7      stay at home, unless you performed an essential function.

02:02PM  8          And so the government through congress decided to pour

02:02PM  9      billions of money through the economy to pump that out as

02:02PM  10     quickly as it could to save the economy, so that employers who

02:03PM  11     had no income coming in or greatly reduced income coming in

02:03PM  12     could pay their employees; so their employees could buy food,

02:03PM  13     spend some money in their local neighborhoods, and do the

02:03PM  14     things we do every day and take for granted even when the

02:03PM  15     economy is bad.  It was about as bad as things could get.

02:03PM  16          And so congress enacted the PPP program, Paycheck

02:03PM  17     Protection Program, for just that purpose; so that employers

02:03PM  18     could pay their employees, keep them on the payroll, hopefully

02:03PM  19     ride out the storm.  We never thought it would be as long as it

02:03PM  20     lasted.  We had some reprieves and thought we were done and

02:03PM  21     then we went back into it, and congress poured more and more

02:03PM  22     money in.

02:03PM  23          So along comes Mr. Kao right at the beginning of this

02:03PM  24     program.  In fact, his first submission for the first loan was

02:04PM  25     actually done on a form that was changed that very night, and

02:04PM 1   he was asked to redo it on the current form, because the SBA

02:04PM 2   was scrambling to put together this program.  And it did put

02:04PM 3   together this program, and it gave -- it told the banks to push

02:04PM 4   out the money, and it said it was going to guarantee all of

02:04PM 5   those loans up to $10 million.  And so while mom-and-pop shops

02:04PM 6   around the state and around the country were applying for

02:04PM 7   10,000 or 25,000, Mr. Kao decided that he would apply for 10

02:04PM 8   million.

02:04PM 9       Now Mr. Kao's company at the time named Navatek was

02:04PM 10  eligible for a fraction of that.  It could have applied for its

02:04PM 11  --  based on its 140-or-so employees and done the formula, the

02:04PM 12  formula that took into account the salaries of those employees

02:04PM 13  up to a hundred thousand, and his company would have been

02:05PM 14  entitled to couple million, maybe a little more, maybe a little

02:05PM 15  less depending on how you really calculate it, he could have

02:05PM 16  done that.  He didn't need to do it because he was a defense

02:05PM 17  contractor.  And even if there was a slight disruption in the

02:05PM 18  money that flowed, that money continued to flow.

02:05PM 19      His customer didn't go away because his primary

02:05PM 20  customer was the U.S. Government.  And that company that was

02:05PM 21  founded by Mr. Loui's father, or at least the related company

02:05PM 22  was, and then grown by Mr. Loui, is a valued defense contractor

02:05PM 23  primarily to the navy.  They deal with boats and ships and

02:05PM 24  hulls and all sorts of things.  Frankly, I don't understand.

02:05PM 25      They employed 140 people, about a hundred in Hawaii at

| | | |
|---|---|---|
| 02:05PM | 1 | the time of that loan.  Many of the jobs were high paying |
| 02:05PM | 2 | engineer jobs, as you might expect.  And so he didn't need the |
| 02:06PM | 3 | money for his company, but he was eligible for a fraction.  But |
| 02:06PM | 4 | that wasn't good enough.  So he put down 400-some-odd |
| 02:06PM | 5 | employees, when it was 140.  They did the calculation, it was |
| 02:06PM | 6 | very simple, it came out above the 10 million max; he got the |
| 02:06PM | 7 | 10 million max. |
| 02:06PM | 8 | And then he went to another bank and he lied to that |
| 02:06PM | 9 | bank.  He said, oh, we're entitled to this.  He used the |
| 02:06PM | 10 | same -- this time he did stick with his 140 employees; but as |
| 02:06PM | 11 | we know, he had already gotten 10 million to cover those 140 |
| 02:06PM | 12 | and then a bunch of imaginary employees.  So he lied to them |
| 02:06PM | 13 | and he got his 2.8 million.  He used a different -- he had a |
| 02:06PM | 14 | number of LLCs related, they were not entitled to different |
| 02:06PM | 15 | pots of money, they were entitled to -- there was one group of |
| 02:06PM | 16 | employees, no matter which payroll they were on, and that's how |
| 02:07PM | 17 | he considered it as well. |
| 02:07PM | 18 | So he got the 2.8 million through deceit, through |
| 02:07PM | 19 | lies.  And then he doctored -- he actually altered the |
| 02:07PM | 20 | promissory note after the fact so that some people, not |
| 02:07PM | 21 | everyone in his organization, because some people knew, but |
| 02:07PM | 22 | some people, perhaps accountants who knew about the earlier |
| 02:07PM | 23 | PPP, perhaps others wouldn't see.  So he took that note and he |
| 02:07PM | 24 | literally on his computer redacted in white all references to |
| 02:07PM | 25 | the PPP program.  So it looked like a standard SBA note to hide |

02:07PM  1  and conceal on top of his lies.

02:07PM  2          And then he went to a third bank, it was the second

02:07PM  3  institution in this state, and he lied to them and they pushed

02:07PM  4  back and he lied again.  And finally they denied it.  They

02:07PM  5  caught him.

02:08PM  6          And so he did all those things when he didn't need to

02:08PM  7  in the first place.  He took $2 million and transferred it to

02:08PM  8  his own coffers.  In part, that 2 million we don't trace it to

02:08PM  9  the Kahala home, that's case number two, but it was in there

02:08PM  10  and it was for evaluation purposes when Merrill Lynch, B of A

02:08PM  11  looked at his application.

02:08PM  12          So he did all those things to the detriment of others

02:08PM  13  who really couldn't pay their employees, who couldn't pay their

02:08PM  14  rent or mortgage for their business, which was one of the other

02:08PM  15  eligible categories.  He didn't need any of that money.  And

02:08PM  16  while doing this, as the Court said, he used influence.  He

02:08PM  17  touted his connections to politicians in this state and beyond

02:08PM  18  and their staffs.  There were implied threats to the first bank

02:08PM  19  that, oh, they would be in touch, they would call, did he need

02:09PM  20  to call them on that bank, one of our largest banks, right?

02:09PM  21          Banks don't want senators being told that they are not

02:09PM  22  abiding by the dictates of a federal program.  They were just

02:09PM  23  struggling with, what do we have to verify?  He was one of the

02:09PM  24  first applicants.  How do we do this?  What standards do we

02:09PM  25  apply?  And he was pushing, pushing, pushing, but the Court

02:09PM   1    knows that.

02:09PM   2         The emails are replete.  The company emails are

02:09PM   3    replete with him and some of his colleagues joking about what

02:09PM   4    they were doing, making fun of it, making fun of others.   It

02:09PM   5    was really terrible stuff, appalling stuff.

02:09PM   6         And so amazingly and incredibly, during that same very

02:09PM   7    time period, he applies -- in the second case, he applies to

02:09PM   8    buy yet another property, and the Court has his financial

02:10PM   9    assets, a $4.5 million property in Kahala.  Pretty nice.  And

02:10PM  10    he wants a loan, so he gets that through Merrill Lynch and B of

02:10PM  11    A and he gets $3 million.  In doing that, he wants -- he again

02:10PM  12    sat down at his computer and he doctored his investment

02:10PM  13    portfolio, and he represented that he had much more money than

02:10PM  14    he did.  Those were material statements.  Whether or not he

02:10PM  15    would have qualified, that bank was going to look at that

02:10PM  16    because that's important.  What does he have?  Does he have the

02:10PM  17    ability to pay?  Can we go against his other assets?  The stuff

02:10PM  18    that is just standard business practices for banks.

02:10PM  19         Why he did that, I don't know.  It makes no sense.

02:10PM  20    Did he need another house?  He had many already in places like

02:10PM  21    Beverly Hills and here and Honolulu.  But to actually engage in

02:11PM  22    that kind of conduct as a professional, he worked -- I don't

02:11PM  23    know whether he has a law degree or not, but he was a business

02:11PM  24    man leading one of the leading companies, maybe not the

02:11PM  25    biggest, but one of the leading companies in this state.  He

02:11PM   1   was sophisticated, he worked for an accounting firm for years

02:11PM   2   before he joined Mr. Loui.  There is no reason he should have

02:11PM   3   done this.  Absolutely no reason.  It was greed, it was deceit,

02:11PM   4   and it was entitlement.  But the Court knows that.

02:11PM   5           So here's what the government recommends.  First of

02:11PM   6   all, the government recommends the low end of the guidelines,

02:11PM   7   87 months.  And we are recommending the low end of the

02:11PM   8   guidelines because we have taken into consideration his

02:12PM   9   post-offense rehabilitative conduct and his volunteering and

02:12PM  10   all of that.  So that's where the government gives him credit

02:12PM  11   for that.  It's ultimately of course up to the Court.

02:12PM  12           I will say, and I've been granted authority to say

02:12PM  13   this by the folks in DC who debriefed him, because you've heard

02:12PM  14   about that, they debriefed him extensively, he provided a lot

02:12PM  15   of information.  No investigation has been launched as a result

02:12PM  16   of those debriefings.  Whether something does, I don't know.

02:12PM  17   And if something does and the prosecutors in Washington are

02:12PM  18   involved with that, and they believe he's entitled to some

02:12PM  19   cooperation credit down the road for that, then they will call

02:12PM  20   me and we will make a decision collectively.  And if he is

02:12PM  21   entitled to it, we will bring the issue back to the Court of

02:13PM  22   course.

02:13PM  23           But from the government's perspective, the Court

02:13PM  24   certainly can take into consideration his debriefings under the

02:13PM  25   statutory sentencing factors, but it did not amount to

02:13PM   1    substantial assistance.

02:13PM   2            All right, so back to the 87 months.  The government

02:13PM   3    defers to the Court on supervised release; that's the Court's

02:13PM   4    resources through its probation office.  With regard to the

02:13PM   5    rest, the forfeiture the Court has already articulated it is

02:13PM   6    $12,841,490 that should be payable to the Small Business

02:13PM   7    Administration.  There is a forfeiture order already in the PPP

02:13PM   8    case for that -- it should be that same amount.  And the Court

02:14PM   9    has already ordered the forfeiture of the over 10 million that

02:14PM  10    the government seized pursuant to warrant from his own

02:14PM  11    accounts, 2 million, and his company's accounts somewhat north

02:14PM  12    of 8 million.  And he will get credit for that toward that

02:14PM  13    forfeiture money judgment of course.

02:14PM  14            With regard to the fine, the government advocates for

02:14PM  15    a $1 million fine.  I mean, Mr. Loui went through some of his

02:14PM  16    assets, the probation has gone through some of his assets, the

02:14PM  17    nature of the crime, I'm not going to belabor it, but the

02:14PM  18    government feels this is one of those relatively rare cases

02:14PM  19    where a fine is appropriate.  And we suggest the top of the

02:14PM  20    guideline, 1 million.

02:14PM  21            I know Ms. Yamaga will have something to say about the

02:14PM  22    criminal forfeiture order entered in the mortgage fraud case

02:15PM  23    and of course you'll listen to her on that.  From the

02:15PM  24    government's perspective, and I do apologize we should have

02:15PM  25    gotten that in earlier, but it's a placeholder, there is no

02:15PM  1    doubt that the government is entitled to forfeiture of the

02:15PM  2    proceeds of that fraud, which are at least 3 million, and

02:15PM  3    that's what came out of that.

02:15PM  4        And the government feels the law is very clear,

02:15PM  5    provided some additional case law that Ms. Yamaga today just

02:15PM  6    moments before, that made clear that the government also gets

02:15PM  7    the appreciation prorated in that house for two-thirds of bank

02:15PM  8    money fraudulently obtained bought that house, one-third of

02:15PM  9    other money, the Kao's money, bought that.

02:15PM  10        But what the Court has entered, from the government's

02:15PM  11   perspective, is a placeholder until we have a foreclosure and a

02:15PM  12   sale.  We just felt, why speculate, why estimate when there is

02:16PM  13   a state process that's going to come up with real numbers.

02:16PM  14   Now, the county says it's worth 7.2, 7.3 million, we'll see

02:16PM  15   what it sells for.

02:16PM  16        I will point out that PacMar has obviously submitted

02:16PM  17   to the probation office a request for restitution.  The

02:16PM  18   probation office has looked at that, I've discussed it with the

02:16PM  19   probation office, PacMar has said to me they would like a

02:16PM  20   restitution hearing so that they can prove up restitution.

02:16PM  21   Essentially, what we are talking about are legal bills, legal

02:16PM  22   costs incurred in responding to subpoenas we issued here for

02:16PM  23   this investigation specific to the PPP case, I think.  And the

02:16PM  24   probation office didn't feel that they could come up with a

02:16PM  25   number based on the submissions.

02:16PM 1         The government is really not in a better position than

02:17PM 2    the probation office, and so I've told PacMar through its

02:17PM 3    counsel that it really needs to parse the legal bills and put

02:17PM 4    them in piles so that the appropriate PAR can be considered by

02:17PM 5    the Court.  If the Court is inclined to set a restitution

02:17PM 6    hearing, it is, of course, my hope that if you do set a

02:17PM 7    restitution hearing that counsel, PacMar, the government, with

02:17PM 8    help from the probation office, will come up with an agreed

02:17PM 9    upon number for the Court's consideration.

02:17PM 10        THE COURT:  So on that, I have a couple of questions.

02:17PM 11   I didn't want to interrupt you, but if you wanted to finish up

02:17PM 12   I'm happy to do that.  So my questions are threefold.  It has

02:17PM 13   to do with the fine, it has to do with PacMar's request for

02:17PM 14   restitution, and I just have a question how come there is no

02:17PM 15   investment information in terms of Mr. Loui had mentioned that

02:17PM 16   he had all of these investment assets.  I didn't see any of

02:18PM 17   that.  I mean, I see the two Mercedes, the Ferrari, the Rolls

02:18PM 18   Royce and then all of this luxury real estate.

02:18PM 19        So the dilemma I find myself in in a fine is that I

02:18PM 20   know that there are several -- I'm personally aware of, because

02:18PM 21   it's in the federal court as a civil lawsuit, one.  So if there

02:18PM 22   was any chance of recovering any kind of damage award, they

02:18PM 23   wouldn't be able to touch the money that he would have to pay

02:18PM 24   towards the fine, because that goes to the government, and I

02:18PM 25   certainly couldn't double dip if PacMar is given a restitution

02:19PM  1    amount that would then be an offset or a setoff, or what have
02:19PM  2    you, that they wouldn't be able to recover those amounts.
02:19PM  3         I'm just trying to figure out on different tracks.  I
02:19PM  4    agree with you that this is one of those rare cases where a
02:19PM  5    fine makes sense, except for the fact that you have all of
02:19PM  6    these other victims that are out there that are seeking civil
02:19PM  7    remedies for the harm that's been done to them.  And the
02:19PM  8    dilemma I find is is it just punishment, so there is an
02:19PM  9    argument for that.  But yet does it then thwart ultimately any
02:19PM  10   kind of recompense to actual victims?
02:19PM  11        MR. NOLAN:  Right.  No, I appreciate the Court's
02:19PM  12   question and observations because that's true.  One reason not
02:19PM  13   to impose a fine here is that PacMar is looking to recover, the
02:20PM  14   SBA is looking to recover, Bank of America is looking to
02:20PM  15   recover.  Frankly, we are hindered here because, at least to my
02:20PM  16   knowledge, and certainly the probation office can correct me if
02:20PM  17   things change, but Mr. Kao never provided a financial
02:20PM  18   disclosure.  And I'm seeing the probation office confirming it.
02:20PM  19        He was asked to provide one, of course.  He didn't
02:20PM  20   sign a plea agreement so I don't have a contractual, right, but
02:20PM  21   in the normal course the probation office asked for that.  And
02:20PM  22   we only have the information -- I believe it goes back to the
02:20PM  23   bail reports.  I don't know if the probation office was able to
02:20PM  24   get more, but Mr. Kao declined to tell the probation office, in
02:20PM  25   response to this request, as to what he has out there.

02:20PM   1        So the government certainly understands that the Court

02:20PM   2   thinks it prudent, given all his outstanding forfeiture

02:21PM   3   judgments, given all of his outstanding judgments in the state

02:21PM   4   and arbitration proceedings, and given what the restitution

02:21PM   5   judgments will be in this case, if the Court decides not to

02:21PM   6   impose a fine.

02:21PM   7        THE COURT:  Yes.  So that's my question with regard to

02:21PM   8   the fines.  That makes sense about the financial disclosure.

02:21PM   9   As I read in the presentence report, it's publicly available

02:21PM  10   information that was provided, obviously, what you do a real

02:21PM  11   estate --

02:21PM  12        MR. NOLAN:  Sure.

02:21PM  13        THE COURT:  -- look it up in the commuter with regard

02:21PM  14   to that and with regard to the automobiles and the outstanding

02:21PM  15   loans.  So that's what would show up.  And there was a report

02:21PM  16   of, even though there were all these properties, who was on the

02:21PM  17   deed.  Okay, so that -- I was just wondering, somebody with

02:21PM  18   these assets, I imagine would have an investment account and

02:22PM  19   Mr. Loui mentioned it, but that makes sense.  Okay.

02:22PM  20        MR. NOLAN:  Right.  So Mr. Loui has been able to do a

02:22PM  21   better job than the government at the moment on some of that.

02:22PM  22   I, of course, haven't verified that information with regard to

02:22PM  23   investment accounts and the like.

02:22PM  24        THE COURT:  They have all those civil actions across

02:22PM  25   the street too, so I'm sure they have gotten a lot of

02:22PM   1    information from that.

02:22PM   2              MR. NOLAN:  And I anticipate of course that after we

02:22PM   3    have judgments from the court that our civil division will

02:22PM   4    start -- will seek leave of court to conduct some discovery and

02:22PM   5    pursue assets out there as well.  The IRS has a lien on that

02:22PM   6    Kahala house.  I think that's in the PSR.  It's somewhere north

02:22PM   7    of a million dollars.  They are a codefendant in the -- or a

02:22PM   8    party in the foreclosure actions.

02:22PM   9              So that's the recommendation of the government.  I'm

02:22PM  10    happy to answer any further questions.

02:22PM  11              THE COURT:  No.  Thank you very much.  I appreciate

02:22PM  12    that.

02:23PM  13              Mr. Bakke.

02:23PM  14              MR. BAKKE:  Your Honor, could I have one moment to

02:23PM  15    consult with the probation officer?  I have a question.

02:23PM  16              THE COURT:  You may.

02:23PM  17              Mr. Bakke, I'm sorry to interrupt.  We have been going

02:23PM  18    for almost an hour.  I think it's fair to the court reporter

02:23PM  19    that we take a brief recess.  Could you consult and then just

02:23PM  20    let Ms. Cortez know when you are ready to proceed and we will

02:23PM  21    take like a ten-minute recess.  Thank you very much.  We stand

02:23PM  22    in recess.

02:23PM  23              (Proceedings were recessed at 2:23 p.m. to 2:32 p.m.)

02:32PM  24              THE COURT:  The record will reflect the presence of

02:32PM  25    counsel and Mr. Kao and Ms. Nieling.

02:32PM   1              So, Mr. Bakke.

02:32PM   2              MR. BAKKE:  Yes, Your Honor.  Thank you.

02:32PM   3              Your Honor, before I get started, on page 23 of the

02:33PM   4    presentence report it talks about criminal history.  And I

02:33PM   5    believe that on paragraph 97, if the Court had earlier said

02:33PM   6    today that the defendant had a prior conviction.  But that was

02:33PM   7    not a conviction under state law, that was a deferral, and the

02:33PM   8    case was dismissed.  So there was never any conviction.  I just

02:33PM   9    wanted to clarify that.

02:33PM  10              THE COURT:  Okay, thank you.

02:33PM  11              MR. BAKKE:  Your Honor, when it comes to sentencing we

02:33PM  12    can sit here all day and talk about what a person did.  And

02:33PM  13    that obviously is where we have to start, okay.  But that is

02:33PM  14    not the end of the story, and we have to balance that under the

02:33PM  15    3553(a) factors with the mitigating factors.

02:33PM  16              And, in fact, just the general life history of a

02:33PM  17    person, because although people have to be held to answer for

02:33PM  18    their individual acts, individual actions don't always

02:34PM  19    completely define a person for their whole life.  And

02:34PM  20    especially at Mr. Kao's age, he hasn't led a life of crime.

02:34PM  21    And these allegations that have brought him here are more types

02:34PM  22    of crimes of opportunity and things like that, as opposed to an

02:34PM  23    orchestrated long running -- this is not a Ponzi scheme, this

02:34PM  24    isn't --

02:34PM  25              THE COURT:  It's not a Ponzi scheme, but it's very

02:34PM   1   involved and it was deliberate.  This is not a bank teller who

02:34PM   2   at Christmas maybe is a single mother and somebody deposits

02:34PM   3   $5,000 of cash and in a moment of weakness she takes the cash.

02:34PM   4   That's understandable.  This took planning, this took

02:34PM   5   leadership.  This was not a matter of just putting in one piece

02:34PM   6   of paper or making a phone call.

02:34PM   7        So I understand what you are saying, it's not a Ponzi

02:34PM   8   scheme where you're reaching out -- but it was quite

02:34PM   9   sophisticated.

02:34PM   10        MR. BAKKE:  Your Honor, with all due respect, we

02:35PM   11   completely disagree with that in a sense of I went through that

02:35PM   12   same situation.  Nobody this side of the bar had to deal with

02:35PM   13   employees, the COVID, the paying your rent, everything like

02:35PM   14   that.  It was chaos.  The problem is Mr. Kao took advantage of

02:35PM   15   that.  And as we know across the country many people took

02:35PM   16   advantage of it that most didn't have any criminal history.

02:35PM   17   But when they saw it there and they saw that opportunity they

02:35PM   18   took it, and it was done over a relatively short period of

02:35PM   19   time.  But I do agree with the Court that, yes, you kind of

02:35PM   20   have had to know what you were doing, you know.

02:35PM   21        THE COURT:  And you kind of had to have the ability to

02:35PM   22   threaten that you could use relationships with senators and

02:35PM   23   congresswomen and throw your weight around with regard to that.

02:35PM   24   That's an aspect of this.

02:35PM   25        MR. BAKKE:  That's correct.  Mr. Kao actually had that

02:35PM   1    weight, so to speak, to throw around.

02:35PM   2         THE COURT:  Right.

02:35PM   3         MR. BAKKE:  So but the real problem started with him

02:36PM   4    even coming up with the stupid idea that we can get a bunch of

02:36PM   5    money here.  And like the prosecutor said, he would have been

02:36PM   6    entitled to something, it looks like, under the regular rules.

02:36PM   7    It's just the way it was calculated.  And there were other

02:36PM   8    companies, if you recall.

02:36PM   9         THE COURT:  The way it was calculated because of

02:36PM   10   abject fraud.  He took numbers of individuals that you said

02:36PM   11   were on your payroll and you inflated it by a factor of

02:36PM   12   several, not double.

02:36PM   13        MR. BAKKE:  Absolutely.  But I think what Mr. Nolan

02:36PM   14   and I were kind of getting at is this was so stupid because it

02:36PM   15   didn't have to be done.  He could have just gone in and said,

02:36PM   16   you know what, I legitimately need this -- even though I have a

02:36PM   17   big company he still could have qualified for something.  But

02:36PM   18   that goes back to greed and despair.  Why didn't he just apply

02:36PM   19   normally, instead of trying to milk it for more than the

02:36PM   20   program --

02:36PM   21        THE COURT:  Well, you could get six times more than

02:36PM   22   apparently he might have been able to qualify for.  Although, I

02:37PM   23   don't know if he really qualified for it because it wasn't

02:37PM   24   meant for people who had like Uncle Sam as the provider.  But

02:37PM   25   even assuming that to be true, we're talking -- well, Mr. Nolan

02:37PM   1    had mentioned somewhere in the neighborhood of $2 million -- we

02:37PM   2    are talking about almost $13 million.

02:37PM   3          MR. BAKKE:  Absolutely, correct, and that's where the

02:37PM   4    crime comes in, Your Honor.  So I'm trying to get into -- you

02:37PM   5    know, about this being a long, drawn out, thought out process.

02:37PM   6    This was something that just came up in a very short period of

02:37PM   7    time, there weren't a lot of rules, it was ripe for abuse,

02:37PM   8    which we found out later through all the cases across the

02:37PM   9    country, and he absolutely has to be held accountable for that.

02:37PM  10          But I'm trying to put it in kind of a framework like

02:37PM  11    we didn't know what was going on.  You had places like Ruth's

02:37PM  12    Chris, Shake Shack, you had major companies all applying for

02:37PM  13    these maximum $10 million loans that they qualified evidently

02:37PM  14    for under the rules.  But when the public kind of heard about

02:38PM  15    it, a lot of those companies let the loan go because of the

02:38PM  16    optics.  It looked bad, why does this big company get all this

02:38PM  17    money and the mom-and-pop shops hardly get anything?

02:38PM  18          Again, not any excuses.  I'm not making any excuses.

02:38PM  19    I'm just trying to put it in a little bit of context because we

02:38PM  20    are talking about Martin's overall character of his whole life

02:38PM  21    that this was a very short period of time.

02:38PM  22          Now, he was very busy during that short period of

02:38PM  23    time, but he had 50 years before that.  He was a good guy,

02:38PM  24    father, all of that stuff.  He was successful.  He had the

02:38PM  25    Ferraris -- he had more than one Ferrari, he had the

02:38PM   1    properties, he was living a successful lifestyle that came from

02:38PM   2    legitimate work.  He is not a drug dealer or something.

02:38PM   3         So we go through all that and then, all of sudden, now

02:39PM   4    he is greedy and deceitful and everything like that.  And I'm

02:39PM   5    looking at that and going, what changed from Martin and the

02:39PM   6    father and everything to this?  Where did he get lost?  Because

02:39PM   7    he wasn't like that before, and the only thing I can find, Your

02:39PM   8    Honor, is when he got involved with Navatek and Mr. Loui and he

02:39PM   9    went to work for them.  And that --

02:39PM  10         THE COURT:  Wait, wait.  Okay, honestly I got to head

02:39PM  11    you off here.  So you are saying because he started working at

02:39PM  12    this firm, from which he has stolen millions of dollars, that

02:39PM  13    that somehow they made him do it or influenced him to do these

02:39PM  14    actions?

02:39PM  15         MR. BAKKE:  Well, Your Honor, I'm unaware of him

02:39PM  16    having stolen millions of dollars from the company.

02:39PM  17         THE COURT:  Well, it was supposed to go to the

02:39PM  18    company, right?  Didn't he apply for the PPP?  It was not for

02:39PM  19    him personally, he wasn't supposed to personally get the money,

02:40PM  20    correct?

02:40PM  21         MR. BAKKE:  Correct, for the company.

02:40PM  22         THE COURT:  Right.  And he put the company's name on

02:40PM  23    it, and he made representations about the company qualifying

02:40PM  24    for PPP.

02:40PM  25         MR. BAKKE:  Yes.

02:40PM  1          THE COURT:  And so then when those get approved, then

02:40PM  2    that money is supposed to go to the applicant, Navatek.  So I'm

02:40PM  3    kind of losing you with saying, well, yeah, but Navatek really

02:40PM  4    didn't lose any money or there is no evidence of Navatek --

02:40PM  5          MR. BAKKE:  They didn't because they weren't entitled

02:40PM  6    to that money to begin with.

02:40PM  7          THE COURT:  You know what, so I get that.  So you are

02:40PM  8    saying that the whole fraud of this, the only victims then are

02:40PM  9    the taxpayer and the banks?

02:40PM  10          MR. BAKKE:  Correct, Your Honor.

02:40PM  11          THE COURT:  Navatek is not a victim.  Is that the

02:40PM  12    point you are trying to make?

02:40PM  13          MR. BAKKE:  As far as the PPP loan itself, because I

02:40PM  14    got a little lost with Mr. Loui talking about all this other

02:40PM  15    collateral damage that may come, and that may be going to

02:40PM  16    restitution.  But where I was going with this, Your Honor, is

02:41PM  17    not he went to work for the company so he stole money from the

02:41PM  18    PPP loan, because we also have the Washington D.C. case.

02:41PM  19          THE COURT:  Yeah, absolutely, which I am taking into

02:41PM  20    account as 3553(a) factors of sentencing because he is a

02:41PM  21    convicted felon in another matter, and I know generally what

02:41PM  22    that involves.  So that's an additional factor I can take into

02:41PM  23    account in evaluating what an appropriate sentence is.  But I

02:41PM  24    don't make any judgment with regard to what happened there

02:41PM  25    because that's not part of my case.

02:41PM   1            MR. BAKKE:  Correct, Your Honor.  We know that it was
02:41PM   2    campaign fraud, making illegal donations to elected officials.
02:41PM   3            THE COURT:  Correct.
02:41PM   4            MR. BAKKE:  So that's kind of where I'm saying is when
02:41PM   5    Mr. Kao came into Navatek, he was not a businessman, he wasn't
02:41PM   6    experiencing government contracting.  Quite frankly, I don't
02:41PM   7    know how he got 99 percent of the company, why they gave it to
02:41PM   8    him.  It appears because they were happy that he did something
02:42PM   9    good for them.
02:42PM  10            THE COURT:  Well, I don't know and I don't want to
02:42PM  11    make any judgment.  What's your point with regard to --
02:42PM  12            MR. BAKKE:  My point, Your Honor, is when he came in
02:42PM  13    that company was rotten already.  And so he learned from
02:42PM  14    Mr. Loui, he learned from them the way they did things, and the
02:42PM  15    way they did things when he came in was already in place.  You
02:42PM  16    pay people for influence, you throw your weight around, you do
02:42PM  17    those kinds of things.
02:42PM  18            Before this thing, when he started, he wasn't any of
02:42PM  19    that kind of stuff.  But he got in there and that's where he
02:42PM  20    lost his way, Your Honor.  He got into that environment, it was
02:42PM  21    big money, it was relatively easy money, and he loved the whole
02:42PM  22    thing of it.  He loved everyone looking up to him and being the
02:42PM  23    boss and flying to DC and being the big company in Hawaii.  And
02:42PM  24    he just got lost.  He got lost in all of that.  And the money,
02:42PM  25    the Ferrari, the whole thing, right.

02:42PM  1          And that's where I'm just trying to put in a little
02:43PM  2  bit of context that that's where -- he went from a normal guy
02:43PM  3  to this super star in the industry and all the benefits that
02:43PM  4  came with it.  And he got lost, he took advantage of it, and
02:43PM  5  then that brings us to the rehabilitation.  Because as high as
02:43PM  6  he went, he fell just as far.
02:43PM  7          And as the -- Court is aware, I don't need to go
02:43PM  8  through all the rehabilitation, but this was all done on his
02:43PM  9  own.  I mean, to me, and I know the Court has read through
02:43PM  10  everything and the Court really I think in other cases, you
02:43PM  11  really take into consideration the letters, right?  Not because
02:43PM  12  it's a letter from a bank president, it's somebody that really
02:43PM  13  knows him and somebody that can really talk to the person.
02:43PM  14          And I've never seen in a case like this where you have
02:43PM  15  letters from the Cheese Cake Factory from his co-workers, where
02:43PM  16  he spent over two years excelling in a job that many people
02:43PM  17  would say, well, that's so below him.  Obviously, there is
02:44PM  18  nothing wrong with working at the Cheese Cake Factory, but it's
02:44PM  19  not the CEO of Navatek.
02:44PM  20          THE COURT:  Understood.  Understood.
02:44PM  21          MR. BAKKE:  And so those things are looking at -- when
02:44PM  22  I go back to 3553(a)is that he has humbled himself, because he
02:44PM  23  went from kind of the zero to the hundred back down almost to
02:44PM  24  the zero.  And that takes a lot of character and a lot of
02:44PM  25  humbling, and he did well, and he excelled at it.  And I think

02:44PM    1    his values changed.

02:44PM    2           And I remember I told him one time, I went to visit

02:44PM    3    him and he said, oh, look at this Ferrari.  I got this Ferrari.

02:44PM    4    And I go, yeah, but you know what, Martin, what's important now

02:44PM    5    is not what's in your garage, it's who lives in your house.

02:44PM    6    That's where your focus and goals are.  And he just looked at

02:44PM    7    me like, I never thought of it that way.  And he's got a

02:44PM    8    beautiful family, and he put them through hell through all of

02:45PM    9    this, and he'll have to attenuate to that.

02:45PM    10          But it's that kind of situation where, you know -- the

02:45PM    11   Harvard thing.  I was like, what do you mean you got into

02:45PM    12   Harvard?  He didn't even tell me.  I found out --

02:45PM    13          THE COURT:  Did it really cost $30,000?

02:45PM    14          MR. BAKKE:  I don't know how much the tuition is.

02:45PM    15          THE DEFENDANT:  It's about $900 a college credit,

02:45PM    16   graduate credit.  I've taken 20 credits already.

02:45PM    17          THE COURT:  And you took 20 credits.  Thank you.

02:45PM    18   Okay.

02:45PM    19          MR. BAKKE:  Again, it's not one of these cases where

02:45PM    20   we are looking so hard at rehabilitation, because that's, as

02:45PM    21   the Court said, that's just one of the factors.  Just one of

02:45PM    22   them.  But it's also a very important one.

02:45PM    23          Obviously, restitution and all that stuff it sounds

02:45PM    24   like we're probably going to have to have a restitution study

02:45PM    25   to sort that out more.  There's also the $2 million after we

02:46PM 1 are done with court here. We have to go downstairs because

02:46PM 2 they are going to take the $2 million that is up on the bail;

02:46PM 3 so we are going to have to sort that out more.

02:46PM 4     What I'm really here about now is with Martin because

02:46PM 5 we hear everything, well, he lied, he lied, he lied. Yeah, no

02:46PM 6 doubt that he lied. I guess my position is, does it really

02:46PM 7 raise it to that much of an aggravating factor in a situation

02:46PM 8 where really the whole charge is lying? I mean, everyone that

02:46PM 9 was charged with PPP loans lied. So it's kind of like that is

02:46PM 10 the crime.

02:46PM 11     THE COURT: Well, it is the crime. Fraud is the

02:46PM 12 crime, right? And then we look at also the amount that the

02:46PM 13 person benefitted by, right? So I admit to you there was a lot

02:46PM 14 of PPP fraud apparently. I don't think the statistics will

02:46PM 15 bear out that there were a lot of fraud in excess of

02:46PM 16 $12 million.

02:46PM 17     MR. BAKKE: I would agree with that. It's about 1 to

02:47PM 18 2 million and then after that it's like 15 or 20. It's kind of

02:47PM 19 like not a real gap in the middle from the cases that I saw.

02:47PM 20     THE COURT: Right. So this is a pretty egregious case

02:47PM 21 in terms of the amount and also his role.

02:47PM 22     So where are you on what's an appropriate sentence?

02:47PM 23     MR. BAKKE: Your Honor, I just believe that under the

02:47PM 24 very unique circumstances of this case, especially such as an

02:47PM 25 exemplary post-offense rehabilitation, I don't know where the

02:47PM   1    actual range should be.  But I would recommend that a guideline

02:47PM   2    range of 87 months is more than necessary to comply with the

02:47PM   3    sentencing goals in 3553(a)(2).  How much?  I'll defer to the

02:47PM   4    Court, Your Honor.

02:47PM   5          But with his background, prior to starting at Navatek

02:47PM   6    and ending at Navatek, prior to that he's led a good life, and

02:48PM   7    he's going to come out of this at some point.  We just got to

02:48PM   8    make sure that it's -- and this is the hard job for you, Your

02:48PM   9    Honor, is the Goldilocks, which is we don't want it too hash

02:48PM   10   but not too soft either.  He definitely has to be made an

02:48PM   11   example of, and he has to atone, and he has to pay and all of

02:48PM   12   that.  I just don't know where that perfect bowl of porridge is

02:48PM   13   at the end of the day, but I believe that 87 months is more

02:48PM   14   than necessary.

02:48PM   15          THE COURT:  Okay.  Thank you very much.

02:48PM   16          Ms. Yamaga, is there anything you wanted to add and

02:48PM   17   then I'll give Mr. Kao an opportunity to speak on his behalf.

02:48PM   18          MS. YAMAGA:  Nothing with respect to the sentence.  I

02:48PM   19   just have a comment on the criminal forfeiture.  Do you want me

02:48PM   20   to address that now?

02:48PM   21          THE COURT:  Sure.

02:48PM   22          MS. YAMAGA:  So as Mr. Nolan alluded to, he and I have

02:48PM   23   had a conversation, I just noted that his motion and proposed

02:48PM   24   order was only filed two days ago, which gave me very little

02:49PM   25   time to review it, in particular, little time to review it with

02:49PM  1  Mr. Kao.

02:49PM  2          I can go through the one legal issue that I noted upon

02:49PM  3  my initial perusal, but what I'm ultimately asking the Court to

02:49PM  4  do is to hold off on the final order of judgment and just give

02:49PM  5  me one week to review it with Mr. Kao --

02:49PM  6          THE COURT:  Absolutely.

02:49PM  7          MS. YAMAGA:  -- and we might not make this one

02:49PM  8  objection that I had already highlighted to Mr. Nolan.

02:49PM  9          THE COURT:  Yes, I think so.  And I think the way the

02:49PM  10  proposed order was is that it was just the fact of the

02:49PM  11  forfeiture wasn't entitled to under the case but not the

02:49PM  12  amount.  And then we're going to have to talk about the

02:49PM  13  calculations.  So I just assume that you are not challenging

02:49PM  14  that the government is entitled to forfeiture, but you are

02:49PM  15  really challenging how that's going to be calculated in the

02:49PM  16  final amount.

02:49PM  17          MS. YAMAGA:  That's correct.  It's the appreciation

02:49PM  18  whether that's --

02:49PM  19          THE COURT:  Yes, and that might be a legal issue for

02:49PM  20  me to rule on.

02:49PM  21          MS. YAMAGA:  Yes, Your Honor.  That's the only issue

02:49PM  22  right now.

02:49PM  23          THE COURT:  Right.  And then the other issue that came

02:49PM  24  up is potentially a restitution hearing with regard to

02:49PM  25  Navatek's claim.

| | | |
|---|---|---|
| 02:49PM | 1 | Do you guys have any position on that, or you guys |
| 02:50PM | 2 | want to think about it and we'll have a status conference? |
| 02:50PM | 3 | MS. YAMAGA: I'd defer to Mr. Bakke. |
| 02:50PM | 4 | THE COURT: Because that's on his, yes. You're on the |
| 02:50PM | 5 | bank loan. Sorry. |
| 02:50PM | 6 | Mr. Bakke. |
| 02:50PM | 7 | MR. BAKKE: Maybe we can have a status conference on |
| 02:50PM | 8 | it. |
| 02:50PM | 9 | THE COURT: Okay, very good. Let's do that because I |
| 02:50PM | 10 | don't have enough information to do that. |
| 02:50PM | 11 | Mr. Kao, you have an opportunity to speak on your |
| 02:50PM | 12 | behalf, it's this time, if you wish. If you don't, it won't be |
| 02:50PM | 13 | held against you. Do you wish to say something to the Court? |
| 02:50PM | 14 | THE DEFENDANT: Yes, Your Honor. |
| 02:50PM | 15 | THE COURT: All right. Please. |
| 02:50PM | 16 | THE DEFENDANT: First of all, good afternoon. |
| 02:50PM | 17 | THE COURT: Good afternoon. |
| 02:50PM | 18 | THE DEFENDANT: Thank you for this opportunity to |
| 02:50PM | 19 | address the Court. |
| 02:50PM | 20 | I'm here because I failed. I'm here today to accept |
| 02:50PM | 21 | responsibility for my mistakes and face the consequences of my |
| 02:50PM | 22 | actions. So I say before this Court, I'm sorry, I have no |
| 02:50PM | 23 | excuses, I acknowledge my mistakes, and I accept full |
| 02:51PM | 24 | responsibility for the wrongs I've committed. |
| 02:51PM | 25 | I can assure the Court that these statements are not |

02:51PM   1   said impiously, but I also do not believe that anything I say

02:51PM   2   today, however genuine, could ever excuse my actions.  At the

02:51PM   3   end, only my actions can.

02:51PM   4           As I've come to learn through my own epistemology, a

02:51PM   5   life journey towards repentance, any genuine contrition,

02:51PM   6   accountability and acceptance of my mistakes cannot be

02:51PM   7   proclaimed, they must be ensued through and from my actions.

02:51PM   8           A lot of people have said a lot of things about me and

02:51PM   9   the person I was when I committed these offenses.  So today let

02:51PM  10   me tell the Court who I was.

02:51PM  11           I was a naive and ignoramus imposture.  So naive, so

02:52PM  12   ignorant that I had no fear or even understanding of the

02:52PM  13   consequences of my actions.  I didn't think that it was illegal

02:52PM  14   or that lying could be prosecuted as a crime.  I wrongfully

02:52PM  15   thought that fraud would result in no direct physical or

02:52PM  16   visceral financial harm was of any consequence.  None of the

02:52PM  17   crimes I'm here before the Court today were contrived or

02:52PM  18   premeditated.  Instead, everything was by opportunity and by

02:52PM  19   chance.

02:52PM  20           So when the banks told me to just apply as I saw fit,

02:52PM  21   to just apply, however it made sense for my company, don't

02:52PM  22   worry about how you apply, we'll figure it out later.  It

02:52PM  23   doesn't matter how you apply.  It only matters how you spend

02:52PM  24   the money.

02:52PM  25           So I saw opportunities in the chaos with the pandemic.

02:52PM  1  And if someone asked questions later -- and I took advantage of

02:53PM  2  it.  And if someone asked questions later, I would just deal

02:53PM  3  with it at that time.  Both of my offenses occurred around the

02:53PM  4  same time, both during the height and frenzy of the pandemic,

02:53PM  5  both crimes of opportunity committed without planning or any

02:53PM  6  forethought.

02:53PM  7       While my mistakes may be borne from situational

02:53PM  8  circumstances, it doesn't make -- mean that there is no

02:53PM  9  accountability for my actions.  For too long I have allowed

02:53PM  10  myself to hide behind the misguided notions of ethics and

02:53PM  11  philosophies of consequentialism, that somehow the end justify

02:53PM  12  the means.  From the false narrative I've painted in my mind,

02:53PM  13  that despite my wrongful conduct and how the company applied

02:53PM  14  for the PPP loans, my actions were justified and even to be

02:53PM  15  celebrated.  Because in the calendar year 2020, despite COVID,

02:53PM  16  despite Hawaii shutting down, despite America shutting down,

02:54PM  17  despite the world shutting down, I still spent $16 million.

02:54PM  18  $15,850,461 to be exact on my employees' payroll salary and

02:54PM  19  wages, most of which are here today.  It included my own salary

02:54PM  20  of $1.  I spent far in excess in payroll in 2020 in the 12.8

02:54PM  21  million my company received in PPP loans.

02:54PM  22       I know this is not a time to get into the details, but

02:54PM  23  I can assure this Court that I did not receive one penny of the

02:54PM  24  PPP money.

02:54PM  25       THE COURT:  I'm sorry, what about the $2 million that

02:54PM   1   was put into your account?

02:54PM   2        THE DEFENDANT:  The $2 million was a distribution for

02:54PM   3   my personal capital account.  And the reason he was able to

02:54PM   4   trace it was because the PPP funds weren't deposited into the

02:55PM   5   company's general business account, which pays payroll, my

02:55PM   6   distributions --

02:55PM   7        THE COURT:  But you know you are being held

02:55PM   8   accountable for the $2 million that was transferred.

02:55PM   9        THE DEFENDANT:  I know.  I understand.

02:55PM  10        THE COURT:  And now you're saying that that was money

02:55PM  11   you were legally entitled to and that was not part of the crime

02:55PM  12   that you committed.  I just want to make sure what you're

02:55PM  13   telling me so I understand it correctly.

02:55PM  14        THE DEFENDANT:  I'm not sure how to explain the

02:55PM  15   semantics other than to say that when we received the PPP

02:55PM  16   loans --

02:55PM  17        THE COURT:  Right.  It went into the company account,

02:55PM  18   it got commingled --

02:55PM  19        THE DEFENDANT:  It went into the company account, two

02:55PM  20   tranches:  One for 10 million and one for 2.8.  When we

02:55PM  21   received the 10 million, we moved 8 million of it into a

02:55PM  22   company account, a higher bearing interest brokerage account.

02:55PM  23        THE COURT:  Okay.

02:55PM  24        THE DEFENDANT:  Company account, company account.

02:55PM  25   From our general business account where we paid salaries, wages

02:56PM 1    and everything else, I made a distribution to myself --

02:56PM 2    actually a loan for $2 million.  So I understand the

02:56PM 3    traceability rule and the money being tainted.  So I understand

02:56PM 4    that dynamic, and I don't --

02:56PM 5           THE COURT:  And that's why I'm having a little

02:56PM 6    difficulty swallowing that you didn't take -- you know, I have

02:56PM 7    to say it's interesting because the dilemma I have on

02:56PM 8    sentencing, quite frankly -- well, I'll let you finish and then

02:56PM 9    I'll let you know some of the concerns I have, but go ahead.

02:56PM 10          THE DEFENDANT:  You know all this, you know, the money

02:56PM 11   fungibility issues, how much money I spent on payroll, I agree

02:56PM 12   it all fueled my delusions of self-righteousness.  I even sent

02:56PM 13   emails that are bragging that our company will be the poster

02:56PM 14   child of PPP.  Once the Small Business Administration came in

02:57PM 15   and audited us on how we spent the money, once congress saw

02:57PM 16   that we talked about my congressional influence on

02:57PM 17   relationships, once they saw how we spent -- how much money we

02:57PM 18   spent on payroll, how I hired and created jobs during the

02:57PM 19   pandemic in each of their individual states, this was across 12

02:57PM 20   different states.

02:57PM 21          THE COURT:  So you're like Robin Hood then, you're

02:57PM 22   actually a good guy doing all of these things.  So no matter

02:57PM 23   how you robbed other people to pay for that, you did only good

02:57PM 24   things with it; is that what you are telling me?

02:57PM 25          THE DEFENDANT:  That's what I fooled myself into

02:57PM  1    believing.

02:57PM  2              THE COURT:  But you understand that's not what

02:57PM  3    happened now, or do you still believe that?  That's the problem

02:57PM  4    I'm having.

02:57PM  5              THE DEFENDANT:  I do believe that.  I do believe that

02:57PM  6    I'm here today because I made a mistake.  I justified my own

02:57PM  7    actions in how I applied.  And I can confess to the crimes I've

02:57PM  8    done, but I cannot accept the things that I didn't do.

02:58PM  9              THE COURT:  Like what, that you didn't do, that are

02:58PM  10   you going to be held accountable in the sentencing or that

02:58PM  11   there are other things that people are mad at you about that

02:58PM  12   has nothing -- what we are talking about is a sentencing.  I'm

02:58PM  13   trying to figure out an appropriate sentence for you, so I'm

02:58PM  14   just -- I just need clarity in my mind.  You said you're not

02:58PM  15   responsible for the things that you didn't do.

02:58PM  16             THE DEFENDANT:  Right.

02:58PM  17             THE COURT:  And I know Mr. Loui talked about a lot of

02:58PM  18   different things and that's in state court.  I'm just looking

02:58PM  19   at what's in the presentence report.

02:58PM  20             THE DEFENDANT:  Okay.  Then I'll disregard what

02:58PM  21   Mr. Loui said.

02:58PM  22             THE COURT:  Yeah.  I don't know what's going on, and I

02:58PM  23   make no judgment with regard to that.  The victims have an

02:58PM  24   opportunity to speak, and they can talk about whatever they

02:58PM  25   want to talk about because they have a right to talk about how

02:58PM   1   they believe they've been affected.  So whatever is going for

02:58PM   2   the garnishment and everything else, that's not part of this

02:58PM   3   case.

02:58PM   4            THE DEFENDANT:  I'll disregard that then.  I'll

02:59PM   5   retract that statement.

02:59PM   6            THE COURT:  Great.

02:59PM   7            THE DEFENDANT:  I understand that lying to myself only

02:59PM   8   prolonged my mental anguish, and I could not accept the

02:59PM   9   consequences of my actions because I refused to confront the

02:59PM  10   reality of my own choices, insisting that I was a victim of

02:59PM  11   prosecutorial zeal.

02:59PM  12            Today I truly see and can clearly see that my mistakes

02:59PM  13   and failures, while manifested in my criminal actions before

02:59PM  14   this court today, are so much more embodied in my failure as a

02:59PM  15   CEO and leader in our business community.  There was no book,

02:59PM  16   no manual, no courses you could take -- that I could take to

02:59PM  17   learn how to be a CEO.  For me, all I knew how to do wrongfully

02:59PM  18   was to emulate those I worked for, their behavior.

02:59PM  19            THE COURT:  So you are not in a drug conspiracy where

03:00PM  20   you are working for the mafia, the Mexican cartel.  This was a

03:00PM  21   whole idea of filling out forms to seek money from a government

03:00PM  22   program where you falsified information.  So what you are

03:00PM  23   telling me is that other people made you do this?

03:00PM  24            THE DEFENDANT:  No, I'm not telling you that at all.

03:00PM  25            THE COURT:  Okay.  You are telling me that you are in

03:00PM    1    a culture where somehow you got the message that this is what

03:00PM    2    you are supposed to do, even though nobody told you directly to

03:00PM    3    multiply the number of -- to falsify and multiply by almost a

03:00PM    4    factor of like three, right, from 150 to 400 employees, that's

03:00PM    5    because you were working in this terrible culture?

03:00PM    6            THE DEFENDANT:  No, my culture that I'm referring to

03:00PM    7    is the culture of political influence and the culture of maybe

03:00PM    8    lawless dispensations.  So when I applied for the PPP loans,

03:01PM    9    the reason I applied the way I applied was, at the time we were

03:01PM    10    growing our company exponentially and, the truth be told, the

03:01PM    11    way we grew our company was by making promises to senate

03:01PM    12    appropriations, congressional appropriation members in exchange

03:01PM    13    for creating jobs in their state.

03:01PM    14            So when the pandemic hit, I was asked and directed by

03:01PM    15    members that I served, Will you continue to honor the job

03:01PM    16    commitments you made in my state?  And I couldn't do that.  I

03:01PM    17    could not have done it without the PPP loan.

03:01PM    18            THE COURT:  Without falsifying the PPP loan so that

03:01PM    19    you would get a six-fold kind of money.

03:02PM    20            THE DEFENDANT:  Correct.  So the PPP loan, the way

03:02PM    21    it's calculated, it's based on historical data.

03:02PM    22            THE COURT:  Right.  So I guess what you are saying is

03:02PM    23    you are arguing it was a crime of necessity?  You had a gun to

03:02PM    24    your head and you had to do this because you made these

03:02PM    25    promises and, therefore, you had to commit fraud?  Honestly, I

03:02PM   1    wouldn't recommend you go down this road, I have to tell you,

03:02PM   2    because it's kind of like blaming your mother for all of this.

03:02PM   3    Well, she didn't raise me right and therefore I committed this.

03:02PM   4    I'm sure that's not what you intend to say.

03:02PM   5              THE DEFENDANT:  No, it's not.

03:02PM   6              THE COURT:  Yeah, but it's going down that road.  So I

03:02PM   7    would just ask you to think about what you want to share with

03:02PM   8    me.  Because what I have before me are fairly discreet acts,

03:02PM   9    right, the two loans, the misrepresentations, six times the

03:02PM  10    amount that the company would have been entitled to, according

03:02PM  11    to the government, and then fraudulently conducting yourself

03:03PM  12    with regard to the mortgage loan.

03:03PM  13              So I don't think anybody else applied for those

03:03PM  14    things, and I understand what you are saying about the

03:03PM  15    different tranches, and then you're being paid out and you

03:03PM  16    ordered this thing.  But the way that the information is is

03:03PM  17    that the 2 million that went into your personal account came

03:03PM  18    from the PPP -- came after the PPP money was deposited with the

03:03PM  19    company.

03:03PM  20              So I'm just going to ask you, what's the point that

03:03PM  21    you're trying to make in terms of explaining to me why you did

03:03PM  22    this other than greed -- or it was greed, but you have a reason

03:03PM  23    for it, like people made you do it.

03:03PM  24              THE DEFENDANT:  It's not that someone made me do it.

03:04PM  25    It's -- whether it's greed or personal pride, I was in a

03:04PM    1    position where during COVID a lot of people were asking for a

03:04PM    2    lot of things, and it felt good to be able to meet those

03:04PM    3    expectations -- rightfully or wrongfully.

03:04PM    4         And as much up as I had hoped to placate my

03:04PM    5    benefactors, maybe wrongfully, through using PPP funds, I

03:05PM    6    understand now that -- and I'm not making excuses for what

03:05PM    7    happened, and I apologize if it came out that way; but again, I

03:05PM    8    can't change the past.

03:05PM    9         THE COURT:  Sure.

03:05PM   10         THE DEFENDANT:  All I can do is accept what I've done.

03:05PM   11    I'm reminded of -- as I stand here before you, facing

03:05PM   12    incarceration, losing my freedom, I'm reminded of a quote from

03:05PM   13    one of my favorite books, Man's Search For Meaning.

03:05PM   14    "Everything can be taken from a man but one thing:  the last of

03:05PM   15    the human freedoms.  To choose one's own attitude in any given

03:06PM   16    set of circumstances, to choose one's own way."

03:06PM   17         I am reminded of a speech I once heard by Chief

03:06PM   18    Justice John Roberts where he gave this commencement speech at

03:06PM   19    his son's graduation and he titled it:  I Wish You Bad Luck.

03:06PM   20    It was a facetious title but one with a great message.  The

03:06PM   21    message being that it's often through life's misfortunes and

03:06PM   22    how we respond that we learn life's greatest lessons.

03:06PM   23         As you know, before going back to school, I worked as

03:07PM   24    a dishwasher and cook.  Before that I applied to work at the

03:07PM   25    American Red Cross and was turned down after they did a

03:07PM   1   background check.  The pain of being rejected doing work when

03:07PM   2   you are offering to do it for free is kind of indescribable.

03:07PM   3   But that misfortune turned what was a pride-swallowing siege of

03:07PM   4   washing dishes and mopping floors into a real appreciation for

03:07PM   5   just having a job.  It turned the misfortune of this

03:07PM   6   circumstance to be working at the restaurant for two years

03:07PM   7   where I met some of the most hard-working and resilient people

03:07PM   8   in my life.

03:08PM   9          Although I can't change the past, I can only look at

03:08PM  10   this process in what it's supposed to be for me.  Truth be

03:08PM  11   told, when I was first arrested and released, my mind went to a

03:08PM  12   very dark place.  I kind of immersed myself -- I became a

03:08PM  13   full-blown alcoholic in less than a month.  I immersed myself

03:08PM  14   in readings of Dostoevsky, Franz Kafka, Tolstoy, those dark

03:08PM  15   allegories of the injustices of our justice system seemed to

03:08PM  16   resonate with me at that time.

03:08PM  17          But do I recognize that this process, while it's easy

03:08PM  18   to forget about the rehabilitation side because of how violent

03:08PM  19   the -- I guess the prosecution and punitive side of it is, I do

03:09PM  20   understand that we are not opponents and that we are actually

03:09PM  21   on the same side.  I think you want for me to be the best

03:09PM  22   version of me possible.

03:09PM  23          THE COURT:  I also want you to pay back all your

03:09PM  24   victims.

03:09PM  25          THE DEFENDANT:  Sure.

03:09PM    1          THE COURT:  So I agree.  I really want you to
03:09PM    2    rehabilitate, I want you to experience remorse and ask for
03:09PM    3    forgiveness.  But most of all, the point is, how are you going
03:09PM    4    to make amends to your family for being away from them for
03:09PM    5    years, to the victims, to your former colleagues for the
03:09PM    6    financial harm and distress?
03:09PM    7          You don't have to give me an answer now.  I don't
03:09PM    8    think there is an answer.  But that's what I'm interested in,
03:09PM    9    you figuring that out during your period of incarceration.  And
03:09PM   10    when you come out and you are on supervised release, there is
03:10PM   11    going to be a significant community service component, because
03:10PM   12    I think you owe that to our community, and then you'll be able
03:10PM   13    to work with probation on criminal thinking.  Because that's
03:10PM   14    what you are describing, this idea that you are better than
03:10PM   15    everybody else, that this is somehow doing actions that serve
03:10PM   16    the greater good.  That's criminal thinking, and they can help
03:10PM   17    you with that.
03:10PM   18          THE DEFENDANT:  I understand.  Thank you for
03:10PM   19    listening.
03:10PM   20          THE COURT:  So my dilemma, what I wanted to share with
03:10PM   21    you, Mr. Kao, is that typically people who stand before me,
03:10PM   22    like when you were saying sort of the defense of necessity,
03:10PM   23    that you felt like you were required to do this because you had
03:10PM   24    to keep your company afloat or what have you, but there are
03:10PM   25    people who facilitate pounds of methamphetamine into our state

03:10PM   1    that destroys families, children, many people's lives and has
03:11PM   2    been for decades that literally have come before me, and it's
03:11PM   3    true that the Mexican mafia had taken their sister and shot her
03:11PM   4    in the head and said, If you don't do this and go to the Big
03:11PM   5    Island and facilitate pounds of making coming into the Big
03:11PM   6    Island, we're going to kill your kid and then we're going to
03:11PM   7    kill you.  So that person is still convicted and sentenced to a
03:11PM   8    mandatory minimum of 20 years.
03:11PM   9            And I've got to say if anybody gets to sort of argue
03:11PM   10   necessity, that's a pretty good thing.  What you told me really
03:11PM   11   doesn't move the needle of necessity; so that's the context I'm
03:11PM   12   putting it in.  I'm putting it in the context of the
03:11PM   13   21-year-old that I need to sentence who has been sexually,
03:11PM   14   physically abused in his childhood, his addictions started
03:11PM   15   because his parents started giving him meth when he was nine or
03:11PM   16   10,  your kids' age -- this kid didn't have a chance -- and he
03:12PM   17   has an addiction and he agrees to carry a bag or receive or
03:12PM   18   whatever.  60 months, five years out of his life, mandatory
03:12PM   19   mandatory minimum.  So that's the context I'm looking at it.
03:12PM   20           And then I look at you, and I look at you with this
03:12PM   21   tremendously privileged life, tremendous intelligence,
03:12PM   22   tremendous abilities, you come from a good family, that you
03:12PM   23   have a good family, that you have the kind of material goods in
03:12PM   24   your life, beautiful homes, rental properties, luxury cars.
03:12PM   25   That 21-year-old never had a chance coming out.

03:12PM  1            Now the law is what the law is and I have to sentence
03:12PM  2    him to five years in prison.  How that's going to help him get
03:12PM  3    a GED, hopefully he will get it in prison and then come back
03:12PM  4    out and work with probation and I'll meet with him regularly
03:12PM  5    because no one has ever taught him that this is the way that
03:12PM  6    you need to proceed in the world.  And it's tough and you have
03:12PM  7    all this trauma, whether you can do this.

03:13PM  8            It's really hard.  I hear what you are saying.  I'm
03:13PM  9    sure it has been devastating for you to be indicted and
03:13PM  10   arrested and have to look at serious time.  The dilemma I have
03:13PM  11   is, in many ways, thinking this through, going through the
03:13PM  12   materials, there is a thing called upward departure, and I
03:13PM  13   think the egregious actions by you in this case really could
03:13PM  14   justify an upward departure way past the top of the guidelines
03:13PM  15   in this case.  Because what you did there was no need to do
03:13PM  16   except for entitlement and greed.

03:13PM  17           On the other hand, I think, how does this help the
03:13PM  18   victims, right?  So there is just punishment, that's a
03:13PM  19   component, to prevent you and others from committing this kind
03:13PM  20   of fraud, so the next time there is a government program that
03:13PM  21   people can apply for, people are going to remember Martin Kao
03:14PM  22   and they are going to say, you know what, the government might
03:14PM  23   come after me, it's not worth the risk.

03:14PM  24           But then there is the other component of this, how do
03:14PM  25   we make amends for the victims, and having you come out of

| | | |
|---|---|---|
| 03:14PM | 1 | prison earlier rather than later, and I know you are able to |
| 03:14PM | 2 | work, whether it's going to be at the Cheesecake Factory or |
| 03:14PM | 3 | someplace else, there is an ability to earn money that you can |
| 03:14PM | 4 | do that may provide some recompense to the victims.  So that's |
| 03:14PM | 5 | really what I'm weighing on. |
| 03:14PM | 6 | The government is saying low end of the guidelines, |
| 03:14PM | 7 | I've told you that I think there is some basis to upwardly |
| 03:14PM | 8 | depart to you having a significant amount.  When I think about |
| 03:14PM | 9 | the 21-year-old kid who gets the 60-month mandatory minimum for |
| 03:14PM | 10 | being stupid, being poor, being traumatized, and then I hear |
| 03:14PM | 11 | your story, I look at 12.8 million, it's really, really hard to |
| 03:15PM | 12 | evaluate.  But I need to concentrate on your 3553(a) factors, |
| 03:15PM | 13 | your personal characteristics, the facts of the offense, the |
| 03:15PM | 14 | harm that's done to our community by your actions.  And that's |
| 03:15PM | 15 | what I'm going to do. |
| 03:15PM | 16 | But I appreciate you sharing your thoughts.  I hope |
| 03:15PM | 17 | that you will think about what I've said and think about what |
| 03:15PM | 18 | you can do when you get out in terms of making amends. |
| 03:15PM | 19 | So the Court is going to state the sentence and |
| 03:15PM | 20 | reasons for the sentence and then I'll invite the attorneys for |
| 03:15PM | 21 | any legal objections with regard to the sentence. |
| 03:15PM | 22 | So the guideline range of imprisonment is 87 to |
| 03:15PM | 23 | 108 months for Counts 1 through 3 and Count 1 and Counts 4 |
| 03:15PM | 24 | through 8 as to each of them.  There are separate counts that |
| 03:16PM | 25 | could run concurrent or consecutive, which means it would have |

03:16PM   1   to be served one at a time.

03:16PM   2            So upon consideration of all the 3553(a) factors, you

03:16PM   3   are committed to the custody of the Bureau of Prisons for a

03:16PM   4   term of 87 months as to each -- let's see, let's make it

03:16PM   5   specific.  As to Counts 1 through 3 under Criminal Number

03:16PM   6   21-61, and Count 1 under Criminal Number 23-03, and Counts 4

03:16PM   7   through 8 under Criminal Number 21-61, to run concurrently.

03:16PM   8            Supervised release of five years as to Counts 1

03:16PM   9   through 3 under Criminal Number 21-61, and Count 1 under

03:16PM   10   Criminal Number 23-03, and three years as to Counts 4 through 8

03:16PM   11   under Criminal Number 21-61.  And that's to run concurrently.

03:17PM   12            No fine.  And I'm making the specific finding that you

03:17PM   13   have financial obligations to the victims.  And rather than

03:17PM   14   imposing a fine that would be paid only to the government after

03:17PM   15   the forfeiture any other financial holdings that you have, I

03:17PM   16   believe should be made available through court means to the

03:17PM   17   victims.

03:17PM   18            Special assessment of $900, $100 for each count for a

03:17PM   19   total of $100.

03:17PM   20            And then the conditions of your supervised release are

03:17PM   21   as follows.  You were previously provided with the 13 standard

03:17PM   22   conditions of release.

03:17PM   23            Do we have a stipulation, Mr. Bakke and Ms. Yamaga?

03:17PM   24            MR. BAKKE:  Yes, Your Honor.

03:17PM   25            MS. YAMAGA:  Yes, Your Honor.

| 03:17PM | 1 | THE COURT:  So the Court doesn't need to -- those are |
| 03:17PM | 2 | imposed without the Court reading it. |
| 03:17PM | 3 | You must abide by the mandatory and standard |
| 03:17PM | 4 | conditions of supervision including the following: |
| 03:18PM | 5 | You do not have a recent history of substance abuse |
| 03:18PM | 6 | and the offense is not drug related, so I waive the mandatory |
| 03:18PM | 7 | drug test condition. |
| 03:18PM | 8 | You must cooperate in the collection of DNA as |
| 03:18PM | 9 | directed by probation. |
| 03:18PM | 10 | You must report to the probation office in the federal |
| 03:18PM | 11 | judicial district where you authorized to reside within 72 |
| 03:18PM | 12 | hours of the time you are released, unless probation instructs |
| 03:18PM | 13 | you to report to a different probation office or within a |
| 03:18PM | 14 | different time frame. |
| 03:18PM | 15 | You must abide by the follow special conditions: |
| 03:18PM | 16 | You must not possess or use alcohol during the term of |
| 03:18PM | 17 | your supervision.  You must warn any other residents or guests |
| 03:18PM | 18 | that you are prohibited from possessing any alcohol on your |
| 03:18PM | 19 | residence and on your property.  You must submit to alcohol |
| 03:18PM | 20 | testing at the direction of probation. |
| 03:18PM | 21 | You must participate in an outpatient mental health |
| 03:18PM | 22 | treatment program and follow the rules and regulations of that |
| 03:18PM | 23 | program.  The probation officer, in consultation with the |
| 03:18PM | 24 | treatment provider, will supervise your participation in the |
| 03:18PM | 25 | program such as provider, location, modality, duration, and |

03:19PM   1    intensity.

03:19PM   2         Restitution of $12,841,490 is due, less any amounts

03:19PM   3    paid to the Small Business Administration, 721, 19th Street,

03:19PM   4    3rd Floor, Room 301, Denver, Colorado 80202.  Any unpaid

03:19PM   5    balance is to be paid during the period of supervision through

03:19PM   6    a monthly installments of 10% of your gross monthly income

03:19PM   7    commencing 30 days after the start of supervision.  The Court

03:19PM   8    may order this requirement to be changed from time to time, as

03:19PM   9    circumstances warrant, but no court order shall be required for

03:19PM   10   your voluntary agreement to pay more than the court-ordered

03:19PM   11   amount.  Interest will begin accruing 30 days after the start

03:19PM   12   of supervision.  Payments must be made by payroll deduction

03:19PM   13   when applicable.  You must notify the probation officer of any

03:19PM   14   change in your financial circumstances that affect your ability

03:19PM   15   to pay.  Your financial circumstances must be reviewed by the

03:20PM   16   probation officer on at least an annual basis.

03:20PM   17        You must provide the probation officer access to any

03:20PM   18   requested financial information and authorize the release of

03:20PM   19   any financial information.  The probation office may share

03:20PM   20   financial information with the U.S. Attorney's office.

03:20PM   21        You must apply all monies received from income tax

03:20PM   22   refunds, lottery winnings, inheritance, judgments and any

03:20PM   23   anticipated or unexpected financial gains to the outstanding

03:20PM   24   court-ordered financial obligation, at the discretion and

03:20PM   25   direction of the Court.

03:20PM    1         You must not incur new credit charges, or open
03:20PM    2    additional lines of credit, or apply for any loans without
03:20PM    3    prior approval of probation.  You must not borrow money or take
03:20PM    4    personal loans from any individual without prior approval of
03:20PM    5    the probation officer.
03:20PM    6         You must maintain a single personal bank account,
03:20PM    7    separate and apart from your spouse, any family members or
03:20PM    8    others, into which all income, financial proceeds, and gains
03:20PM    9    must be deposited and from which all expenses must be paid.
03:20PM   10         You must notify the probation officer of any
03:21PM   11    contemplated employment and must obtain approval from the
03:21PM   12    probation officer for all employment.  Unless you are
03:21PM   13    self-employed, you may not be employed in any capacity wherein
03:21PM   14    you have custody, control or management of your employees'
03:21PM   15    funds.
03:21PM   16         You must complete 12,800 hours of community service.
03:21PM   17    The probation officer will supervise your completion of
03:21PM   18    community service hours, including approving the community
03:21PM   19    service site, the frequency of participation, etcetera.  You
03:21PM   20    must provide written verification of completed hours to the
03:21PM   21    probation officer.
03:21PM   22         Finally, you must submit your person, property house,
03:21PM   23    residence, vehicle, papers or office to a search conducted by a
03:21PM   24    United States probation officer.  Failure to submit to a search
03:21PM   25    may be grounds for revocation of release.  You must warn any

03:21PM  1    other occupants that the premises may be subject to searches

03:21PM  2    pursuant to this condition.  The probation officer may conduct

03:21PM  3    the search under this condition only when reasonable suspicion

03:22PM  4    exists that you have violated a condition of supervision and

03:22PM  5    that the areas to be searched contains evidence of this

03:22PM  6    violation.  Any search must be conducted at a reasonable time

03:22PM  7    and in a reasonable manner.

03:22PM  8            Before I impose the sentence as stated, any legal

03:22PM  9    objections from the government?

03:22PM  10           MR. NOLAN:  Your Honor, I just wanted to ask the Court

03:22PM  11   in 21-61 to incorporate the forfeiture orders at the PPP case

03:22PM  12   at ECF numbers 116 and 123.  And then you've said you are going

03:22PM  13   to give the defense some time I think in 23-3.

03:22PM  14           THE COURT:  Yes.  And so in 21-61 that will be

03:22PM  15   incorporated -- the order of forfeiture will be incorporated

03:22PM  16   into the judgment.  We'll just have to wait for the amount.

03:22PM  17           MR. NOLAN:  And no legal objections.

03:22PM  18           THE COURT:  All right.

03:22PM  19           Mr. Bakke.

03:22PM  20           MR. BAKKE:  No legal objections, Your Honor.

03:22PM  21           THE COURT:  Ms. Yamaga.

03:22PM  22           MS. YAMAGA:  So I do -- I'm asking that the order of

03:23PM  23   forfeiture in 23-03-LEK not be made final today.  It's not

03:23PM  24   titled as a preliminary order of forfeiture, but I'm acting as

03:23PM  25   if it is a preliminary, and I'm asking that it not be made

03:23PM  1    final so that I may make legal objections if needed.

03:23PM  2             THE COURT:  Okay, very well.  So I'm going to give you

03:23PM  3    a week.

03:23PM  4             And what date would that be, Ms. Cortez?

03:23PM  5             So if you could file any objections and then, Mr.

03:23PM  6    Nolan, if you want to file a response, let me know.

03:23PM  7             MR. NOLAN:  Okay, thank you.

03:23PM  8             THE CLERK:  Your Honor, February 20th.

03:23PM  9             THE COURT:  Any objection?  By February 20th, of

03:23PM  10   course, meet and confer.  If you can work it out, that would be

03:23PM  11   great.

03:23PM  12            MS. YAMAGA:  Thank you.

03:23PM  13            THE COURT:  And the import of the 12,800 community

03:23PM  14   service hours, which is the most I've ever imposed, obviously

03:23PM  15   is to reflect the harm to the community of $12,800,000.

03:23PM  16            All right.  So I impose the sentence as stated.  I

03:24PM  17   have considered the advisory guideline computations and the

03:24PM  18   sentencing factors under 18 U.S.C., Section 3553(a).  As I

03:24PM  19   explained more fully in my assessment of the specific

03:24PM  20   aggravating and mitigating factors in your case, Mr. Kao, I

03:24PM  21   have considered your history and characteristics as well as the

03:24PM  22   serious harm to our community caused by your offenses.

03:24PM  23            I have read the letters received on your behalf, I

03:24PM  24   believe the sentence provides just punishment and, equally

03:24PM  25   important, I hope it serves as an adequate deterrence to others

03:24PM  1   who may consider this type of fraud.

03:24PM  2          I hope that this sentence will discourage others from

03:24PM  3   heading down such a life-altering path.  I have considered the

03:24PM  4   sentencing guidelines and the policy statements and the law.

03:24PM  5   So I impose the sentence as stated.

03:24PM  6          You do have the right to appeal your sentence and the

03:25PM  7   manner in which it was determined.  But the deadline to file

03:25PM  8   your notice of appeal is 14 days after your judgment is filed.

03:25PM  9   If you file after those 14 days, you may be found to be too

03:25PM  10  late and given up your right to appeal.  Do you understand

03:25PM  11  this?

03:25PM  12          THE DEFENDANT:  Yes, Your Honor.

03:25PM  13          THE COURT:  All right.  So do you want me to make any

03:25PM  14  recommendations to the Bureau of Prisons as to designation?

03:25PM  15          MR. BAKKE:  Yes, Your Honor.  To Sheridan.  I think

03:25PM  16  it's FCI Sheridan.

03:25PM  17          THE COURT:  Okay, FCI Sheridan.  That's it?  There is

03:25PM  18  no programming or anything.  He doesn't have a drug problem,

03:25PM  19  he's already got a college degree.

03:25PM  20          MR. BAKKE:  Well, Your Honor, he would like help with

03:25PM  21  the RDAP program for the alcohol.

03:25PM  22          THE COURT:  I can make a recommendation for the

03:25PM  23  500-hour residential drug treatment program.

03:25PM  24          MR. BAKKE:  Yes, if you could.

03:25PM  25          THE COURT:  Okay.  All right.  And so any objection to

03:25PM    1    self-surrender?

03:25PM    2              MR. NOLAN:  No, Your Honor.  It was recommended by the

03:25PM    3    probation office and the government will follow their

03:25PM    4    recommendation.

03:25PM    5              THE COURT:  All right, very good.  Let's have a date

03:26PM    6    for the self-surrender.

03:26PM    7              THE CLERK:  Yes, Your Honor.  Self-surrender to the

03:26PM    8    facility will be March 25, 2025.

03:26PM    9              THE COURT:  All right, March 25, 2025, Mr. Bakke and

03:26PM   10    Ms. Yamaga.

03:26PM   11              Mr. Kao, do you intend to pay for your own way and

03:26PM   12    self-surrender, or do you want to turn yourself into the

03:26PM   13    marshals here?

03:26PM   14              MR. BAKKE:  I'll discuss with that with him because we

03:26PM   15    still have that case in DC to deal with logistically.

03:26PM   16              THE COURT:  I understand that, but he has to

03:26PM   17    self-surrender on March 25th.

03:26PM   18              MR. BAKKE:  Correct.  But I'm just saying between

03:26PM   19    turning himself -- I'm sorry, did you say turn himself into

03:26PM   20    FDC?

03:26PM   21              THE COURT:  So Bureau of Prisons is going to designate

03:26PM   22    him to the facility that he is going to be serving the time at.

03:26PM   23    So he can either fly on his own expense or he can turn himself

03:26PM   24    in to the marshals and be held here and then the marshals will

03:26PM   25    transport him.

03:26PM    1              MR. BAKKE:  Right, I understand that.  Just so I

03:27PM    2    understand -- yes, we want to self-surrender.

03:27PM    3              THE COURT:  Right.  And so you are ordered to

03:27PM    4    self-surrender by March 25, noon of the time zone in which the

03:27PM    5    facility you've been designated to serve your term of

03:27PM    6    incarceration.  If you fail to show up or you show up late, a

03:27PM    7    bench warrant can issue for your arrest and that would not be a

03:27PM    8    good thing.

03:27PM    9              So you have the date, you can work with pretrial

03:27PM    10   services on what you need to do in order to turn yourself in at

03:27PM    11   the Bureau of Prisons facility.

03:27PM    12             Anything else?

03:27PM    13             MR. NOLAN:  No, Your Honor.  Thank you.

03:27PM    14             THE COURT:  All right.  And then I guess I would want

03:27PM    15   briefing or something from you on what we should do with

03:27PM    16   Navatek's restitution request.  So I would suggest that you

03:27PM    17   confer with counsel and maybe Navatek and then write me a

03:27PM    18   letter with a CC to everybody, this is the discussion, this is

03:27PM    19   what we believe we want from the Court.

03:27PM    20             MR. NOLAN:  Could we have two weeks to do that?

03:28PM    21             THE COURT:  Absolutely, yes.  I don't think there is

03:28PM    22   any rush.

03:28PM    23             MR. NOLAN:  Okay.  Thank you.

03:28PM    24             THE COURT:  Two weeks would be.

03:28PM    25             THE CLERK:  February 27, 2025.

03:28PM  1          THE COURT:  All right, February 27th, see if you could

03:28PM  2    get me that.

03:28PM  3          MR. NOLAN:  Thank you.

03:28PM  4          THE COURT:  Very good.  Nothing further, Ms. Yamaga.

03:28PM  5          MS. YAMAGA:  No, Your Honor.  Thank you.

03:28PM  6          THE COURT:  Mr. Bakke.

03:28PM  7          MR. BAKKE:  Nothing, Your Honor.

03:28PM  8          THE COURT:  And, Ms. Nieling, anything else?

03:28PM  9          MS. NIELING:  No, Your Honor.

03:28PM  10         THE COURT:  All right.  So good luck to you, Mr. Kao.

03:28PM  11   We stand in recess.  Thank you everyone.

03:28PM  12         (Proceedings were concluded at 3:28 p.m.)

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

```
 1              COURT REPORTER'S CERTIFICATE
 2        I, Gloria T. Bediamol, Official Court Reporter, United
 3  States District Court, District of Hawaii, do hereby certify
 4  that pursuant to 28 U.S.C. §753 the foregoing is a complete,
 5  true, and correct transcript from the stenographically reported
 6  proceedings held in the above-entitled matter and that the
 7  transcript page format is in conformance with the regulations
 8  of the Judicial Conference of the United States.
 9
10        DATED at Honolulu, Hawaii, February 28, 2025.
11
12
13                              /s/ Gloria T. Bediamol
14                              GLORIA T. BEDIAMOL.
15                              RMR, CRR, FCR
16
17
18
19
20
21
22
23
24
25
```